## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA    )
)
*ex rel.* ZHI GUO (a/k/a Han Gao)    )
8509 25th Avenue    )    Case No.:
East Elmhurst, NY 11370    )
)    **FILED UNDER SEAL**
*ex rel.* PENGCHENG SI    )
3712 Powell Lane    )    **Pursuant to False Claims Act**
Falls Church, VA 22041    )
)    DEMAND FOR JURY TRIAL
           Plaintiff-Relators,    )
)
BRING THIS ACTION ON BEHALF    )
OF THE UNITED STATES OF AMERICA    )
)
c/o    )
JESSIE K. LIU    )
UNITED STATES ATTORNEY    )
United States Attorney's Office    )
555 4th Street, NW    )
Washington, D.C. 20530    )
)
CHAD A. READLER    )
ACTING ASSISTANT ATTORNEY GENERAL    )
OF THE UNITED STATES    )
U.S. Department of Justice    )
950 Pennsylvania Avenue, NW    )
Washington, D.C. 20530    )
)
         v.    )
)
NATIONAL ENDOWMENT FOR DEMOCRACY    )
1025 F Street NW, Suite 800    )
Washington, DC 20004    )
)
   Serve:  Carl Gershman    )
           1025 F Street NW, Suite 800    )
           Washington, DC 20004    )
)
INDEPENDENT CHINESE PEN CENTER    )
12917 Centre Park Cir #117    )
Herdon, Virginia 20171    )
)
   Serve:  Resident Agent    )
           Emily Wu    )
           12917 Centre Park Cir #117    )
           Herdon, Virginia 20171    )

Yu Zhang                                          )
12917 Centre Park Cir #117                        )
Herdon, Virginia 20171                            )
                                                  )
   Serve:  Resident Agent           )
       Emily Wu   )
       12917 Centre Park Cir #117  )
       Herdon, Virginia 20171  )
                                                  )
PRINCETON CHINA INITIATIVE                        )
14124 Estate Manor Dr                             )
Gainesville, VA 20155                             )
                                                  )
   Serve:  Resident Agent           )
       Kuide Chen  )
       14124 Estate Manor Dr  )
       Gainesville, VA 20155  )
                                                  )
LAOGAI RESEARCH FOUNDATION                        )
1901 18th Street NW                               )
Washington, DC 20009                              )
                                                  )
   Serve:  Registered Agent         )
       Fengshi Yang  )
       1901 18th Street NW  )
       Washington, DC 20009  )
                                                  )
      and                 )
                                                  )
Does 1 – 10                                       )
                                                  )
      Defendants.         )
_____               )

## COMPLAINT

1.  This is an action commenced by *qui tam* relators Zhi Guo (a/k/a Han Gao) and Pengcheng Si on behalf of themselves and in the name of the United States of America to recover from the abovenamed defendants (collectively "Defendants") damages and civil penalties and equitable relief arising from false claims presented to the federal government, conspiracy, and other violations of the federal False Claims Act, 31 U.S.C. §3729, *et seq.*, as amended. This action seeks to recover damages and equitable and other relief, sustained by and penalties owed to the United States and damages otherwise sustained by the relators, because of

1

an ongoing and continuing fraudulent scheme or schemes knowingly entered into and/or knowingly facilitated by each of the defendants in violation of the False Claims Act, as alleged herein.

2.   Defendant National Endowment for Democracy Inc., with the assistance of the other defendants, knowingly submitted, caused to be submitted or facilitated the submission of false and fraudulent documents to the federally funded China Democracy Program administered by the United States Department of State. Defendants' fraud takes various forms, including creating false invoices to claim entitlement to reimbursement for services and personnel, fraudulently billing for services that were never performed or for sub-par services, fraudulently billing for lodging, services and equipment used for personal reasons, falsely claiming travel money in scheme to defraud the government for services more costly than the best price in order to raise profits, falsely claiming personnel as employees under the contract when they were not actually hired, as a result of which the defendants cost the United States money that rendered no value to the government in violation of the contracts of Defendants with the Department of State.

3.   During the relevant time period, Defendant National Endowment for Democracy Inc., with the assistance of various named and undentified defendants, participated in multiple multi-billion dollar contracts from the U.S. government, mainly through China Democracy Program.

## JURISDICTION AND VENUE

4.   Plaintiff-Relators hereby alleges causes of action under the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3729, *et seq.*, arising from the defendants' actions to defraud the U.S. DOS, an agency of the United States government.

5.   Jurisdiction over all stated causes of action is conferred upon this Court by 31 U.S.C. § 3729 and 3732 and 28 U.S.C. § 1331 and 1345, in that this action arises under the laws of the United States.

6.   Venue is proper in the United States District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732, because this Court has jurisdiction over at least one defendant who can be found in, resides, transacts business, or has performed acts proscribed by 31 U.S.C. § 3729 in the District of Columbia, and the False Claims Act provides for nationwide jurisdiction of such claims under 31 U.S.C. § 3732(a). Each Defendant also caused false claims to be made or falsely certified in this jurisdiction.

7.   Plaintiff-Relators have complied with all conditions precedent to bringing this action.

## STATUTORY AND REGULATORY FRAMEWORK

8.   Originally enacted in the 1860s to combat fraud against the Union Army during the Civil War, the False Claims Act ("FCA") is the primary tool with which the United States combats false claims and fraud against the Government and protects the public fisc.

9.   The FCA provides for the award of treble damages and civil penalties for, among other acts, (i) knowingly or recklessly submitting, or causing the submission of, false or fraudulent claims for payment to the United States Government, (ii) knowingly or recklessly using a false record or making a false statement material to a claim, and (iii) knowingly or recklessly concealing or failing to disclose obligations to pay the Government.

10. The FCA, as amended by the Fraud Enforcement and Recovery Act of 2009, provides, in part, that anyone who:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G); … or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted [for inflation] …, plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1)(A)-(C), (G).

11. For purposes of the FCA, "the terms 'knowing' and 'knowingly' - (A) mean that a person, with respect to information - (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud[.]" 31 U.S.C. § 3729(b)(1).

## PARTIES AND BACKGROUND INFORMATION

### PARTIES

12. Plaintiff, the United States of America, provides all funding for contracts at issue with Corporate Defendant[1] and administers those contracts through the Department of State ("DOS").

13. Relators Zhi Guo ("Relator Guo" or "Mr. Guo") and Pengcheng Si ("Relator Si" or "Mr. Si") are Chinese political dissidents and writers residing in the United States as set forth in caption above. Both are previously employed by or associated with Corporate Defendant(s), and have direct and personal knowledge relating to Defendants' fraudulent schemes.

14. Defendant Independent Chinese Pen Center Inc. ("ICPC") is a not-for-profit corporation registered in the commonwealth of Virginia, and its registered address is 12917 Centre Park Cir. #117, Herdon, Virginia 20171. ICPC has received exclusive or nearly exclusive funding annually from Defendant NED. ICPC has entered into multiple contracts with agencies of the United States, primarily through the DOS's China Democracy Program.

---

[1] National Endowment for Democracy Inc., Independent Chinese Pen Center Inc., and Princeton China Initiative Inc. will be referred to collectively as "Corporate Defendants."

15. Defendant Princeton China Initiative Inc. ("PCI") is a non-profit corporation organized in Virginia with its principal place of business at 14124 Estate Manor Drive, Gainesville, Virginia 20155. PCI has entered into multiple contracts with agencies of the United States, primarily through the DOS's China Democracy Program.

16. Defendant Yu Zhang ("Defendant Zhang" or "Mr. Zhang") was and is an officer of Defendant ICPC. Mr. Zhang resides in Sweden. At all time relevant, he was a signatory on ICPC proposals and on other documents relevant to the DOS contracts and various federal compliance. Mr. Zhang is sued in his individual capacity and official capacity.

17. Defendant National Endowment for Democracy Inc. ("NED") is a not-for-profit corporation chartered under the District of Columbia with principal place of business located at 1025 F Street NW, Suite 800, Washington, DC 20004. NED received billions of dollars in federal funds to hire staff and run its operations. The special restricted grants received by NED and the other defendants at issue in this case were from the DOS based on contracts between the DOS and NED, which were variations of the following contract number "Grant No. S-LMAQM-YY-GR-NNN" or "Grant No. S-OESDR-YY-GR-NNN." NED knowingly facilitated the fraud scheme and knowingly caused false claims to be submitted to the U.S. Government by obtaining federally funded China Democracy Program contracts when NED knew, or should have known, that itself and the other defendants were concealing material information from the U.S. government. This included falsified invoices; billed at unreasonable rates; charged China Democracy Program for services not performed; provided sub-par services, or failed to provide them at all; and hired unqualified individuals. Furthermore, many of the payments knowingly derived from the fraud scheme, and thereby charged to the Government, were paid, at the request of NED officers and directors, to their friends and acquaintances.

18. The Does Defendants are other parties who participated in, and/or faciliated, federally funded grants, contracts, and cooperative agreements under the direction of Defendants and are liable for violations of the False Claims Act. These defendants named above as DOES 1 through 10, inclusive, will be properly served and joined as parties, at such time as they are ascertained.

19. Defendant Laogai Research Foundation Inc. ("LRF") is a non-profit corporation organized in Virginia with its principal place of business at 1901 18th Street NW, Washington, DC 20009. LRF was formerly funded by CDP. Based on information and belief, a merger agreement or other similar co-operation agreement was entered between PCI and LRF in or about 2017-2018.

**Democracy Fund Accounts and China Democracy Program ("CDP")**

20. In 1983, NED filed its articles of incorporation in the District of Columbia. As a not-for-profit corporation, the NED's mission in part is to generally promote U.S. democratic ideals.

21. Beginning in the fall of 1998, Congress took steps in the direction of a democracy program for China by passing legislation, in conjunction with the FY1999 appropriations process, authorizing the DOS to set aside a portion of its "economic support funds" to provide assistance to "nongovernmental organizations located outside of the People's Republic China" for the purpose of "fostering democracy" in China. See Omnibus Consolidated and Emergency Supplemental Appropriations Act of 1999, Public Law No. 105-277.

22. Further, the legislation granting China permanent normal trade relations ("PNTR") in 2000 explicitly included a promise of additional funds to overseas Chinese democracy movements.

23. Since its fiscal 2001 Foreign Operations Bill, Congress has annually authorized the DOS to maintain a special restricted fund dedicated to the support for U.S. based non-governmental organizations engaged in activities to "foster rule of law" in China. In FY2018,

Congress appropriated $215 million for Democracy Fund, of which $150 million for the Department of State Human Rights and Democracy Fund. See Department of State, Foreign Operations, and Related Programs Appropriations Act of 2018, Public Law No. 115-141.

24. Despite being facing competition among several prospective recipients, such as Robert Kennedy Foundation and Jamestown Foundation, NED has submitted bids and been consistently awarded CDP contracts from the DOS since 2002 till date. These contracts are renewable, usually with a five years term. Some contracts are extendable to six years or seven years based on mutual agreements between the DOS and NED. For example, S-LMAQM-06-GR-009, a contract signed between NED and the DOS in 2005, specified the period of performance from October 1, 2005 to August 31, 2010 and provided $74 million funding. For another example, S-LMAQM-09-GR-533, a contract signed between NED and the DOS in 2008, specified the period of performance from October 1, 2008 to August 31, 2013 and provided $115 million funding.

25. NED functioned as a de facto decision-making body of CDP by passing through work to other CDP participants. There is a provision, referenced to NED's contracts with the DOS as governing the operation, contained in every contract NED executed with the other Defendants.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

26. The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

### A. Regulatory requirements in regards to CDP described the eligibility criteria to participate in the Program

27. As a prerequisite to participation in CDP and to further payment under those government contracts subsequently awarded through that program, applicants must apply and qualify for participation through a formal NED-administrated application process. Those wishing to participate in the program were required to submit a short-form application AQPG

(Accounting Questionnaire for Prospective Grantees), certifying their U.S. non-governmental organizational status, employee information, financial structure, and qualifications of financial staff.

28. As a prerequisite of receiving grant and contract funds from CDP, a recipient must also agree to the special conditions of the grant which include the requirement that it must comply with the financial and administrative requirements set out in OMB Circular A-122 "Cost Principles for Nonprofit Organizations" and 22 CFR 145 "Grants and Agreements with Institutions of Higher Education, Hospitals, and Other Non-Profit Organizations", which specifies in pertinent part that participants ensured that they will not use funds for personal reasons, lobbying activities, or conduct self dealings.

29. After executing a contract when submitted money request, Defendants certified on Form VSBA199 (Verification of Separate Bank Account) that they maintained a restricted bank account which would "be used only for the receipt and maintenance of Endowment grant funds", "no funds from other sources" will be contained in that account, and expenditures would be made "directly to payees by check or direct transfer from the above bank account." Further, Defendants certified that such certifications were true, complete, and considered material representations.

30. During the performance and renewal processes, all CDP funded firms must submit biannual cumulative assessments, annual and quarterly reviews (narrative and financial) that NED uses to monitor eligibility. Firms can remain in CDP provided they maintain that eligibility.

31. The DOS requires the above disclosures, among other reasons, so that it can determine such certification is an absolute condition precedent to retaining the CDP program

funds conditionally advanced by the U.S. Government, not to mention a prerequisite to continued future participation in the program.

**B. ICPC's Fraudulent Schemes**

32. Defendant ICPC continued to seek and obtain CDP funds from 2004 through at least the end of 2017. ICPC fraudulently induced CDP to execute contracts with it by falsely stating and certifying through proposals and/or on the contracts themselves that they met the eligibility criteria to participate in CDP and that they obeyed legal restrictions and corresponding limitations on how the money were spent imposed on them by the contracts.

33. ICPC's false certifications or representations included: 1) that it met regulatory requirements to participate in CDP as a U.S. based non-governmental organization ("NGO"); 2) it had to pay certain employees or contractors for their services while such persons never provided any services and a sham contract or a contract that the parties understood was fake was reported to bill CDP; 3) it had to pay certain employees or contractors for their services while such persons were never paid and that funds was retained for personal use or non-CDP contract related work; 4) it had certain key personnel working for them and/or such individuals were on their management bodies when these individuals were not performing such services nor in the positions asserted; 5) that costs charged to CDP shall abide by relevant regulations while actually money was used for payments of personal expenses, improper lobbying purpose, gifts, or other purposes inconsistent with the contract; and 6) that expenses would be made directly from restricted bank accounts while actually money was distributed by and through secret accounts bypasing oversight to various persons overseas for improper purpose or for purpose inconsistent with the contract.

**(a) Federal Funds was used for personal expenses by defendants officers and their families and friends, or was given as gifts to individuals or organizations personally or politically close to them.**

34. Under the terms of its contract, the process for determining ICPC's charges to CDP depended upon the type of service. ICPC billed for travels and for labor under cost-reimbursable line items, which permit ICPC to be reimbursed for its actual costs, provided those costs are reasonable and in the proposed budget range. From 2008 through at least late 2017, ICPC submitted price proposals for at least fifteen different periods of performance, as CDP repeatedly granted payments.

35. ICPC's charges to the government for its services included additional amounts for payments to personnel in China for non-CDP contract related work, which is specifically prohibited by the law setting up CDP and the terms of the DOS contracts. Yet, ICPC took the liberty to use the money as it wants.

36. For example, ICPC set up a Writer in Prison ("WIP") project, and provided lodging, transportation, attorney fees and other services to support blog writers in China. If a blog writer was detained by the Chinese authorities or there was media attention on someone who suffered injustice, ICPC would announce that person as an honorary ICPC member[2] without his/her knowledge or consent. ICPC would then request more funding from CDP for the purpose of "humanitarian assistance" by listing that individual on its financial and narrative reports. This project, valued at around $50,000 (included administrative add on) per year, caused compliance issues when it was initially billed under an un-definitized firm-fixed-price line item as "humanitarian expenses" invoices to the Government for payment. ICPC then changed the billing type and buried it under categories such as labor and travel expenses to avoid scrutiny. This meant that cash was paid to China's blog writers, their family members, and attorneys, either for attorney fees defending them in China's courts or for compensation of their lodging, transportation, and living expenses. These were costs ICPC incurred that were not directly

---

[2] ICPC currently has around less than 200 honorary members.

attributable to a single specific CDP contract, task order, or other cost objective. Such expenses were actually contributions, donations, or gifts to individuals or organizations, and constituted materially false claims to the DOS for worthless services.

37. ICPC submitted payment requests for such work at least forty different periods of performance from 2008 to 2017, as Defendant NED repeatedly granted payments.

38. In many other circumstances, ICPC fraudulently reported to NED the salaries budgeted for certain employees to obtain additional funding. This additional funding was not used to compensate the employees or contractors but instead was either used on unallowed spending or used by Defendant Zhang, who was serving ICPC as executive secretary at most times relevant to this case, for personal use. For example, ICPC faked a WIP project coordinator position, that was not in existence in 2015, to obtain additional program funding of approximately $18,000. These overinflated monies were used for personal use of Defendant Zhang and his friend Li, and were also given as prizes (value at $2,000) to persons who were personally or politically close to Zhang.

**(b) illegal money distribution and fraudulent timesheesheet**

39. ICPC subcontracted the provision of labor to several different personnel. The rates provided by ICPC for local expenses, subcontractors, and managers were not real, which deprived the United States of value for payments it made from 2008 to 2017 for overhead and personnel. For example, ICPC hired X and Y, two of its members in China, to perform sham work and paid each person around $20,000 per year from 2013 to 2015. X and Y did not conduct any actual work for ICPC, yet ICPC submitted budget proposals and NED accepted the fake services by listing X and Y as headers of ICPC's in-China "mini-programs." Further, when X was incarcerated by the Chinese authorities in 2015 and was unable to perform any work, ICPC

continued paying her as if she was working for the period. PCI thus falsely submitted fraudulent documents including fake timesheets to support its claims for payment.

40. Another matter that came to Relators' attention involved billing irregularities to various unidentified persons. For example, ICPC in 2015 distributed $15,700, $23,500 and $40,000 in lump sums into secret personal bank accounts in China for expenses inconsistent with the CDP contract. The ICPC's non-compliant practices resulted in the improper billing of nearly $80,000 for FY2015 to CDP. When questioned by Relator Si, who was listed as ICPC treasurer or "cashior"[sic] responsible for "keeping all invoices and expense documentation" and "managing cash" in ICPC's reports to CDP at that time, about banking procedure and legitimate concerns of the expenditure, ICPC and Zhang insisted that the money was used for in-China personnel's "convenience use" and that Relator, as a "cashior" of ICPC, has no reason and no right to know about the spending details. ICPC processed the transactions over Relator's objection.

41. In a separate incident, on January 14, 2015, Relator learned that ICPC had been billing CDP for satellite office use in Hong Kong for around $1,000 monthly, even though that "office" was actually a bookstore and was solely used for personal bookstore business of Dan. Relator stated that such conduct was billing fraud, and he therefore refused to process the transactions as Defendant Zhang frequently instructed him to pay. Relator Si raised the billing matter with the ICPC Board. Nevertheless, the Board, of which Dan was a member, decided to pay Dan for the "office" ICPC never rented or used. From around 2012 to early 2016, ICPC billed CDP around $50,000 for this never happened office rental.

**(c)  Falsely certified its eligibility criteria during the bidding and renewal processes**

42. ICPC is required to identify the key individuals, whether paid staff or volunteers, who would be in charge of carrying out the project and describe their most relevant qualifications.

ICPC hid its eligibility criteria so as to remain in CDP and retain the program money by certifing in its Form VSBA199, proposals, grant applications, and narritive reports that it had experienced accounting persons to undertake all financial management. Yet, the person who was conducting accountant functions for ICPC was Defendant Zhang, a Chinese citizen with Sweden residence permit who has never been trained or certified in accounting. Mr. Zhang has little knowledge, if anything, about corporate laws or accounting.

43. While making false statements that it had sound financial structure and management, ICPC refused to comply with incorporation requirements. ICPC falsely certified its corporation status in 2011 so as to mislead CDP into continuing providing fund when it lost its New York corporate license and Federal non-profit status due to mismanagement.

44. Further, ICPC failed to file tax returns for its Virginia non-profit entity for 2013-2015. It also refused to file federal information returns and failed to issue Form 1099s for its U.S. based contractors at all relevant time. ICPC and Zhang insisted that they have no responsibility to file tax returns or issue tax forms especially considering that NED instructed them not to file. When Relator objected to these accounting wrongdoing and fraud, the Board reprimanded him as betraying "ethical values and honor of ICPC" for persisting on submitting appropriate tax returns.

45. In addition, as part of the scheme, it is believed that the name and signature of Relator Si was forged by ICPC onto paperwork related to payment of the invoices, including on Form VSBA199 and Form ARP (Authorization to Request Payment or Reimbursement), giving the false appearance that Relator Si was aware of, and approved, the false and fraudulent invoices. Relator Si, however, was not performing such services nor in the position of accountant. Relator Si was being kept out of ICPC's finance communication loop, and financial transactions were conducted largely without his knowledge.

46. Falsely listing individuals with high qualifications as Vice President of ICPC also occurred in proposals and grant applications so as to mislead CDP into believing ICPC had highly qualified individuals to lead the organization. For example, Professor Yexin Sha, a prominent writer who never agreed to serve as Vice-President for ICPC, was listed as the first Vice-President from 2010 to 2013 on all grant applications and reports and other materials. Professor Sha only agreed to be a member to the board and, upon information and belief, openly condemned the misuse of his name.

47. Additionally, from 2016 to 2018, ICPC falsified in its reports to CDP, included on Forms AQPG, grant applications, and narrtive reports, that it established a compliance committee led by Relator Si working under direct supervision of its board. Yet, Relator Si was not in that position and the compliance committee never existed. ICPC fabricated these to alleviate outside scrutiny on its financial irregularities so as to retain money received from CDP.

**(d) <u>Reverse False Claim</u>**

48. ICPC certified in its contracts that "any of the funds made available to the Grantee are unexpended and unobligated upon the expiration date of the Grant, a check payable to the National Endowment for Democracy, or a wire transfer to the Endowment's bank account, for the amount of the unspent funds shall be forwarded with the Final Financial Report." ICPC further certified that the funding for a specified purpose of use in one budget category will not be used for another purpose or be transferred to another budget category, and that any remaining funds under one budget category will be returned to CDP at the end of the fiscal year.

49. Such certifications were false. ICPC frequently moved funds from one budget category to another to avoid returning any unused portion to CDP. For example, Relator's position was budgeted and funded by CDP, and he was supposed to receive payments from ICPC for his service for ICPC from 2014 to March 2016. ICPC knowingly used the budgeted salary for

improper uses and refused to pay him. Neither ICPC returned the money back to CDP. For another example, ICPC should pay remuneration, another budgeted expense category, to outside contributors for their work but failed to full pay those authors and hid its misues. In August 2016, an ICPC member in charge of remuneration matters complained in writing that he was deceived by Defendants ICPC and Yu to sign a $9,000 reciept while he never received that money. Based on information and belief, the reciept nevertheless was submitted to NED for accounting and consolidated financial reporting purpose. ICPC submitted the fraudulent reciept so as to avoid remitting money it owed to CDP. In October 2018, when responding to an author's inquiry regarding unpaid remuneration of $500 which should have been paid to him one year ago, Defendant Zhang explained in a responding email that ICPC was unable to pay that author because the budgeted remuneration money from CDP was fraudulently claimed by its former President Huang and had been spent on other matters.

50. Moreover, ICPC was required to report if it received "financial support from other sources for the proposed activity or other activities, [and] provide a list of the donors." To avoid the obligation to return the money to CDP, ICPC falsely certified on its Form AQPG, proposals, grant applications, and narritive reports that it did not have any local contributions in addition to CDP funds prior to applying for the funding. NED then noted in the application that ICPC has "endowment funds only" and therefore provided exclusive or nearly exclusive funding to ICPC. Nevertheless, contributions were frequently made to ICPC, and ICPC had received financial support from other sources for the proposed activity or other activities. For example, two Europien institutes granted €21,250 and €10,000 to ICPC in 2011 and 2013 repectively. An individual made donations of several tens of thousands of dollars to ICPC for many years. ICPC also accepted Relator Si's cash donations of around $4,000 in periods from 2014 to 2015. ICPC did not disclose such donations to CDP and kept some moneies in its offshore bank accounts.

The Government relied upon ICPC's false statements in evaluating its submission and provided exclusive funding for all of its operations, resulting in additional award to ICPC and in the Government being harmed.

51. ICPC's refusal of returning the unused funds, in some instances, was so blatant that NED stepped in to warn ICPC. For example, in January 2015, NED Program Manager Leah Flynn communicated with ICPC and Zhang, highlighting to them that NED sent the grant amount of $100,000 for the period but only received accounting for $16,618. After this communication, ICPC simply submitted a fraudulent report that appeared as if ICPC full spent all the granted money legitimately while actually the funds stayed in its bank account unused till after the expiration date of the Grant. These misrepresentations were made with the intent to avoid any sort of repayment of federal funds unused.

52. Additionally, ICPC was obliged under the contract to maintain the funds in a restricted bank account. ICPC cerfitied, when it applied for funding, sought renewal, or requested a distribution from Defendant NED, that the designated restricted account would "be used only for the receipt and maintenance of Endowment grant funds", "no funds from other sources" will be contained in that account, and expenditures would be made "directly to payees by check or direct transfer from the above bank account". ICPC further certified that such certifications were true, complete, and considered material representations. Such certification were false.

53. In March 2016, due to irreconcilable differences and mismanagement in the affairs of the company, ICPC split into two separate organizations (hereinafter "ICPC" and "ICPC-2"). ICPC took away around $80,000, of which around $40,000 was in restricted CDP bank account, and ICPC-2 took all the remaining amount of about $10,000. Both ICPC and ICPC-2 used the money for personal use or on non-CDP contract related work, and blamed the counterpart for

improper use of the CDP funding. ICPC and ICPC-2 further threatened to sue each other over the control of the organization and the whole funds. Notably, on April 4, 2018, Defendant Zhang wrote to ICPC Board affirming that $14,559 CDP money was taken away by ICPC's former President Huang, who started ICPC-2 and assumed the President position of ICPC-2 after separation with ICPC, without any accounting journals being created.

54. While acknowledging fundamental changes occurred in its restricted bank account and the certifications (even if it is true) formerly made to CDP regarding financial structure and bank accounts were no longer in existence, ICPC failed to re-certify its eligibility to participate CDP and hid its financial information to avoid remitting the remaining funds back. ICPC thereafter continued to make false statements and provided CDP false records in the form of statements of explanation and periodic certifications on Form VSBAs that justified the spending, including but not limited to on the following occasions: March-June 2016, September 2016, December 2017, and April 2018. ICPC knew that the remaining amount of around $100,000 in its accounts must be returned to CDP before March 31, 2016, the expiration date of the Grant. Yet ICPC never remitted the afore-mentioned unused balance back.

**C.  The PCI Fraud Scheme**

55. Defendant PCI fraudulently induced CDP to execute contracts with it from 2008 through at least 2018 by falsely stating and certifying through proposals and/or on the contracts themselves that it met the eligibility criteria to participate in CDP and that it obeyed legal restrictions and corresponding limitations on how the money were spent imposed on it by the contracts.

56. PCI's false certifications or representations included: 1) that it met regulatory requirements to participate CDP as a U.S. based NGO; 2) that it had to pay certain employees or contractors for their services while such persons never provided any services and a sham contract

or a contract that the parties understood was fake was reported to bill CDP; 3) that costs charged to CDP shall abide by relevant regulations while actually money was used as gifts, or for payments of personal expenses, or other purposes inconsistent with the contract.

### (a) Falsely certified its eligibility criteria during the bidding and renewal processes

57. "U.S. based non-governmental organization" certification was a prerequisite to participation in CDP. CDP does not make grants to individuals, Governmental bodies, agencies or instrumentalities thereof. All prospective participants in CDP must satisfy prior to the commencement of the application that they have the requisite bidding credentials.

58. PCI knowingly made a false certification in its pre-qualification submission concerning its bidding credentials. PCI knowingly made false statements to CDP concerning its owned branches and employees in order to pre-qualify for the contract. Since at least 2008, PCI has been engaged in a scheme to claim payments from CDP for services rendered by fake employees whom PCI knew were neither properly engaged nor credentialed. In furtherance of this scheme, PCI repeatedly certified to CDP that various employees had satisfied the contractually mandated participating requirements when, in fact, PCI knew that the persons had no employment or service relationship and were not qualified to participate CDP.

59. Despite the fact that E and F were independent organizations which have no connection with PCI, PCI concealed the information by submitting a false certification in its pre-qualification submission. To bypass the requirement so as to grant money to persons or organizations who were not qualified to participant in the Program, PCI included C and D on its application as headers of PCI's two branches E and F, submitted a successful bid to CDP from 2010 to 2015 and made representations during the accompanying bidding and applications processes in support of their participation. On its Form VSBAs, proposals, grant applications,

and narritive reports, PCI identified that E, F, and PCI itself as "three distinct branches" and cerfitied that PCI, the single applicant organization, owned and led all of the three branches.

60. C and D falsely and fraudulently obtained recognition of themselves as persons leading PCI operations, thereby receiving a "U.S. based non-profit organization" credential, the requisite bidding credentials. C, D, and PCI togeother sought and was awarded a grant amount of around less than 1 million dollars each year.

61. PCI's failure to disclose its real relationship with C and D and hid their arrangements from the Government was material to the Government's payment decision. The Government has relied upon PCI's false statements and certification regarding its organization status, resulting in the award of around $1 million per year to unqualified participants and in the Government being harmed.

**(b)  <u>False credential of its organization and sham employment arrangement</u>**

62. PCI has also knowingly made false statement to the Government regarding its available personnel for the contract. PCI is required to provide the description of budget items with CDP. The detail of the description includes: budget for salaries showing the titles of those employees to be paid and indicating the percentage of time devoted to project and duration (months) of total annual salary that CDP funds will cover. PCI falsely claimed A, B, and G as employees when they were not actually hired and submitted fraudulent documents to support its claims for payment.

63.  In its pre-qualification and following submissions, PCI listed G as an employee of the company who conducted services. However, the listed individual was a fictitious employee. G is  a New York-based freelance writer and a long time friend of Louisa Greve, NED's Vice President, and Andrew Nathan, NED's Board Director. Ms. Greve wanted to give money to G personally and dictated PCI to do so after a personal meeting at NED with G and his wife. G

supposedly began working for PCI in 2010, but PCI's own website (in Chinese) did not identify G as an employee at PCI. Moreover, in G's advertising biography on his own website, he declared he only had employment relationship with his own firm. G's employment with PCI is not referenced. This is remarkable because G was disclosing the 8 years he supposedly worked at PCI, but makes no mention of his experience at PCI. To be sure, G did not perform any actual work or services for PCI. Remarkably, he stayed in New York and never actually appeared for work or maintained set hours, nor did he process or conduct any real work for PCI. Indeed, PCI did not provide G with an office, a telephone number (including cell), business cards, or even an email address.

64. Ms. Greve from NED and Mr. Chen from PCI negotiated a sham arrangement to put G as senior researcher on PCI contract. NED facilitated the illicit payments, valued at around $20,000 per year since 2010, during the course of the arrangement, up till at least mid-2018.

65. Similar to G, A and B were individuals highly favored by NED because of their personal relationship with NED program manager Louisa Chiang, Vice-Prsident Louisa Greve, and Board Director Andrew Nathan. A and B, each of them had no real employment or service relationship with PCI. Yet, PCI put the scheme in place, and NED paid PCI a total of approximately $500,000 via A, B, and other persons' sham employment arrangement from 2011 through 2015.

66. NED's directors and officers knew or should have known the real relationship between PCI and A, B and G. Yet, they allowed PCI to include these individuals on the contract so as to distribute funds to their friends and acquaintances on the reason that these personnel were facing financial need and that as new immigrants to the United States they lacked resources to establish their organizations for purpose of participating in CDP. As such, A, B, and G falsely and fraudulently obtained recognition of themselves as employees or contractors of PCI, thereby

avoiding barriers of making grants to individuals under CDP. PCI falsely submitted fraudulent documents including fake timesheets to support its claims for payment.

67. NED facilitated the illicit payments during the course of the arrangement. A, B, and G's supposed employment at PCI was never disclosed to the government.

### (c) PCI camouflaged its wrongful conduct by continuing to hide H's involvement in periodic submissions to NED

68. Defendant PCI submitted an application to NED to construct a Chinese news website in late 2008. On that application, PCI, per the direction of its President Chen,  identified H as IT network consultant and sought for compensation for payments to that person monthly.

69. During the bidding and renewal processes, PCI certified on Form AQPGs, proposals, grant applications, and narritive reports that there was no conflict of interest that would vitiate PCI's eligibility for participatition in the program. PCI's certifications were false. In actuality, H, a family member of Chen, had substantial involvement with PCI. To hide her participartion, H set up a single-member LLC. In so doing, PCI could continue paying the overflated value of the service for her work. PCI failed to disclose the real party or parties-in-interest to its application.

70. PCI routinely had the company compensate relatives of its President such as H as "consultant" even though they did not perform much work for the company. These individuals were billed monthly through a family company as if they regularly performed work for PCI but they did not do so.

71. PCI knowingly failed to report H and her LLC's true interests and involvement in PCI on its applications or otherwise to CDP. As such, the Government did not receive the full service price to which it was entitled.

### D.  The NED Fraud Scheme

72. NED participated in and caused to be submitted afore-mentioned materially false claims to the DOS.

73. As a condition for receiving grant and contract funds from the DOS, NED knew that each recipient must certify compliance of the following financial and administrative requirements set forth in the effective regulations:

a) Recipients must meet the NGO eligibility criteria to participate in CDP.

b) Funds may not be used for personal expenditures of any kind.

c) Funds may not be used for contributions, donations, or gifts to individuals or organizations.

d) Funds may not be used for lobbying, including influencing or attempting to influence any federal employee, member of Congress, or member of Congress' staff. Participants need to sign an agreement, Standard Form LLL, stating that the lobbying certification is "a material representation of fact upon which reliance [is] placed when this transaction [is] made or entered into."

e) These contracts denoted "of interest" that were specifically prohibited. Defendants were prohibited from using the funding for purposes that are, or give the appearance of being motivated for private financial gain for themselves or family members, or others with whom they have personal ties.

74. NED exercised substantial day-to-day control over CDP and functioned as a de facto decision-making body of CDP when passing through work to other entities. NED was generally aware that all monies received through the DOS are federal funds and have corresponding limitations on how they are spent.

75. NED accepted from 2005 to 2018 each of around twenty grant contracts (included relevant amendments) and the special conditions attached to each of the twenty contracts.

76. Despite its certifications and its acceptance of each of the contacts' special conditions, NED fraudulently claimed and received reimbursements of the DOS grant monies for the costs it spent for personal expenditures, gave as gifts, or incurred to conduct lobbying activities.

77. Additionally, for every contract that's executed between NED and non-NED defendants, NED cited the DOS contracts as controlling agreements even non-NED defendants

did not sign those contracts separately. Yet in its role as de facto controller for CDP, NED approved the false and fraudulent invoices for payment under the DOS contract when other non-NED Defendants created and submitted false and fraudulent invoices for payment.

78. Throughout their performance, NED acknowledged internally that Defendants ICPC, PCI, and DOES were recognized risks and not competitive with other similar organizations. For example, NED noted in its internal audit report several times that Defendants PCI and ICPC had significant risks because of their "system of accounting, as described indicates an average or weak system of controls."

79. NED knew that ICPC's rates were inflated because of self dealings and payments as gift to Defendant Zhang and those close to him, and that ICPC was not actually paying remuneration expenses, rental expenses, and the salaries that ICPC incorporated into the rates it proposed to CDP. NED also knew that the competition was paying significantly lower rates, that PCI's rates were inflated because of its fraudulent bill and self-dealing with subcontractors or relatives.

80. However, NED routinely awarded no bid contracts to these unqualified defendants and charged the DOS the rates that Defendants claimed for their service, without disclosing that they were uncompetitive. NED therefore claimed to the DOS incorporated claims for inflated value of service that was worth greatly less than they billed, and knowingly made material false statements and key omissions about unreasonable program costs that distorted its negotiations with the DOS.

81. The false and fraudulent invoices purported to describe service and work which, as NED and other defendants both knew, had not been and would not be provided. For example, NED officers knew the true nature of WIP project of ICPC, but consistantly funded that project and distributed the money to ICPC for personal use. For another example, NED was fully aware

that A, B, C, D, and Doe Defendants did not have the requisite bidding credentials, but by and through their officers and directors who have personal interests in funding outcomes, together sought a grant amount of no less than $2 million per year to unqualified participants (A, B, C, D, and Does Defendants) and in the Government being harmed. Quite notably, NED had to dicharge its program manager Louisa Chiang in or about 2015 because she inflated the amounts sought by several CDP applicants and manipulated grant application process too much. By misrepresenting and omitting information reflecting the true nature and bases of contractor's services, NED at least skewed price negotiations with the DOS and caused the DOS to agree to higher contract prices than it otherwise would have.

82. Further, substantial lobbying actions were taken to influence members of Congress and their staff and Executive branch officials and their staff with respect to (a) pending legislation and the introduction of legislation that directly and indirectly affected the programs that funded the Defendants, (b) policy decisions by the Legislative and Executive Branches with respect to programs directly and indirectly affecting the programs that funded the Defendants, and (c) policy decisions with respect to China's interactions with the United States on a variety of issues. NED knowingly and intentionally submitted false invoices reflecting these expenses such as airline tickets, lodging, meals, and other expenses as if they were compliant on a regular basis to the DOS. Examples of such submission includes: compensation to Steve Bannon for his Novemeber 2017's Tokyo travel for attending an event organized by a CDP-funded firm and for advocating Mr. Bannon's political agenda, and payments to support CDP-funded firms launching a campaign against then-presidential candidate Donald Trump in Presidential Election of 2016.

83. From 2008 till the present, NED knowingly passed on tens of millions of dollars of unjustified and inflated charges under the DOS contracts.

**The conspiracy between NED and PCI**

84. Without any competitive bid process, NED granted CDP contracts to PCI for improper projects. PCI was funded because NED wanted to use the funds to get another organization LRF marginalized from CDP.

85. Acknowledging that LRF, a longtime CDP funded firm, was embroiled in scandals involving financial improprieties and corruption, NED would not ceased LRF's funding even when NED internal audit department reported that LRF grant was at "high risk" due to its lack of internal control. Yet, NED tried to reach a mutual understanding with LRF by simply giving the money to LRF as a gift. NED President Carl Gershman instructed his staff to explain to LRF that NED had to cut LRF's funding because NED lost 3 million in the DOS's China fund.

86. Based on information and belief, NED developed a plan on how to "handle" LRF and its President, Mr. Gershman noted to his team in a meeting that NED can simply "give" $345,000 to LRF to keep it quiet and not to protest against NED's funding of PCI. To prepare his staff for criticism from LRF, Mr. Gershman stated, "we will say, look, [PCI] came in with a good proposal, we made savings elsewhere as well, and it is a superior product." Mr. Gershman further prepared an alternative solution, a fake story for his team to tell LRF, *i.e.*, a grantee did not submit a renewal proposal, so NED unexpectedly has more money and would be able to fund PCI.

87. In or about November of 2008, Mr. Chen, PCI's President met in person with Anna Brettell, NED program manager, and Louisa Greve, then NED director in charge of East Asia affairs, at NED's offices and further devised a scheme. The illicit agreement reached at the meeting was memorialized in an internal memo the following weeks, which set forth that Mr. Chen, an employee of LRF, would be paid to leave LRF to start his own PCI project.

**The claims being submitted by NED were materially false in several respects**

88. First, NED inflated the services being provided to the DOS. During the period 2008 to the present, NED intentionally and knowingly submitted materially false claims to the DOS, including but not limited to the aforemetioned ICPC and PCI projects. Dedandants PCI, ICPC, and DOES, at the direction of Defendant NED's officers and directors, submitted grant applications, proposals, and reports, that either inflated qualifications of key personnel or listed certain individuals in positions that they never held at any time. For example, PCI was actually paying their fictitious employees such as A, B, C, D, and G for not providing any services the salaries that NED incorporated into the rates it proposed to the Government. NED submitted price proposals for programs that justified the awarding on the basis of PCI's quote.

89. Second, NED repeatedly and routinely falsified contract forms, which are the forms that NED was directed to use to record the hours worked by its contractors and submitted with the invoices to the government for payment and administrative add on. NED falsified records to show that contrators were working when they were not, creating a fictitious system of "humanntarian expenses" to create a façade of work when contractors were permitted and encouraged to pay for non-CDP contract related work, including payments to lawyers for defending non-CDP contract related personnel in lawsuits brought by the Chinese government, expenses to family members of those being sued by the government, or just for those persons' "convenience use", with the participation of NED Program Managers Leah Flynn, Sinchang Chiu, Marta Casey, Vice-Prsident Louisa Greve, and Board Director Andrew Nathan. NED knew or should have known that it was using the funds as contributions or gifts to individuals or organizations who provided no service to CDP, yet charged those to the Government nonetheless, without disclosing that they were not performing any services. For example, when L, a prominent Chinese activist, was held as a prisoner by Chinese Authorities, NED continued paying his salary to L's family for more than three years from 2008 to 2012 as if L was still

working for a CDP funded firm even he did not and was not be able work at that time. For another instance, when X, header of ICPC's in-China "mini-program", was incarcerated by the Chinese authorities and was unable to perform any work for CDP, NED continued paying her as if she was working. While fully aware that those expenses were unallowable, NED allowed and approved such payments. Moreover, NED, by and through its officers and directors, instructed ICPC and other defendants to bury their problematic expenses under other budget categories (e.g., labor or travel) different from "humanitarian assistance" so as to hide the real spending at issue. NED knowingly or should have reasonably known that it prepared and maintained falsified application Form AQPGs, proposals, grant applications, narritive reports, and submitted false invoices reflecting these falsified documentations on a yearly and five-yearly basis to the DOS under all of ICPC and PCI projects as well as others to be identified during the periods from 2008 till date under CDP identified above. These false statements occurred at least fifty times and were done to mislead the DOS into paying NED and other Corporate Defendants the funds to which they were not entitled.

90. Third, NED falsely certified it was in compliance with prohibition on personal expenditures clause. However, personal or family travel expenses were charged to the Government. For example, Defendant PCI used the funding for personal trips abroad and domestic, including but not limited to its President's trip to Hong Kong in May 2010 to meet with his wife and families. For another example, in 2010, another CDP funded firm W spent around $230,000 for personl use of its directors and provided no accounting regarding what was spent. Based on information, while the DOS's IG office started an inverstigation against W, NED still submitted false invoices reflecting these expenses to the Government and did not remit the wrongfully disbursed funds back to CDP.

91. Fourth, NED falsely certified it was in compliance with anti-lobbying clauses under the contract to pay for lobbying expenses. Yet it knowingly and intentionally submitted false invoices reflecting these expenses such as airline tickets, lodging, meals, and other expenses as if they were compliant on a regular basis to the DOS. In addition to conducting its own illegal lobbying activities, NED also sponsored and paid for lobbying activities of other CDP funded firms. Examples of illegal lobbying include but not limited to: 1) In Presidential Election of 2016, several CDP-funded firms launched a campaign attacking then-presidential candidate Donald Trump for his "smear[ing] the 1989 students' peaceful protest in Beijing as a riot" and calling the public not to support Trump because "world dictators who would happily welcome his like-minded company if he became president." 2) In 2017-2018, ICPC and other CDP-funded firms denounced Trump and his Administration as "hooligan and cheater who never cares about human rights" and a "regime learning from Chinese Communist Party to control speech" by distributing writing materials in the communties. 3) In 2018, ICPC and other CDP-funded firms supported Pen America's litigation against President Trump for his alleged using the machinery of government to retaliate against journalists and media outlets. These false claims used to falsely account for CDP monies used for lobbying activities and obtain reimbursement for costs associated with these lobbying activities includes, but is not limited to submitting false claims for: (1) travel and per diem; (2) newspaper advertisement and internet advertisement; (3) staff time; (4) compensation for employees; (5) administrative, overhead, and other general expenses; (6) computers, other office equipment and supplies; (7) office space; (8) printing, mailing, and other distribution costs; and (9) e-mail accounts, websites, and other technology services.

92. Fifth, these claims were also legally false in that the unqualified participants were incorporated into the relevant contracts, and both the United States and Defendants understood that, as a condition of payment, "U.S. based non-profit organization" credential were required to

satify before entering CDP. Notably, despite knowledge that PCI and ICPC were ineligible for reimbursement because it either failed to comply with incorporation requirements or was not in compliance with the Office of Inspector General guidelines and other federal laws regarding CDP projects, NED, by and through its officers and directors, concealed X, Y, A, B, C, D, and G's requisite participating credentials and supposed employment at ICPC and PCI from the Government. The charges for X, Y, A, B, C, D, and G were billed as a fixed-price line item. While fully aware that those persons were supposed employees of PCI and ICPC receiving compensation, NED charged the DOS the rates that PCI and ICPC claimed for these persons. Additionally, based on the false and fraudulent invoices, many of these payments to the above persons and entities were paid at the requests of Defendant NED's directors and staffs to friends and acquaintances connected to them.

93. Therefore, NED knew or shold have known it submitted materially false claims to the DOS for worthless services, fraudulent billing, false certifications of work done under the contract that was not done, or was done for personal pleasure of employees of NED or other Corporate Defendants, false claims for work not performed by fictitious individuals, faulty or worthless services, or non-existent products and services, as well as for inflated billing and pass throughs.

94. The submission of these materially false claims on a yearly basis and a five yearly basis since at least 2008 caused the United States to pay NED funds to which it was not entitled. Based on representations of NED's upper management during one of the meeting sessions, this also occurred routinely in other CDP funded firms as to which NED has contracts with the DOS. During the period from at least 2008 to date, these false and fraudulent claims caused the United States to pay NED an estimated $200 million dollars that should not have been paid.

**E.  Retaliation against Relators**

95. Relators had kept alerting Defendants of their billing irregularities and compliance issues.

96. As early as in 2005, Relator Guo questioned problematic spending behaviors of ICPC, including but not limited to, using the funds for personal use or non-CDP contract related work. Regardless of all the acknowledged irregularities, Louisa Greve, then NED director in charge of East Asia affairs, acknowledged and supported ICPC's position by informing ICPC's board member Yu when met with him at NED's office. Further, NED program manager Anna Brettell communicated with Yu and Defendant Zhang in February 2007 at an event in Hong Kong that ICPC was doing a right thing when handling Guo's complaint. ICPC then continued its misconduct, reprimanded Guo, and demanded an apology from him for his inquiry to financial matters.

97. On or around September 3, 2007, ICPC terminated Relator Guo's membership for his continuing voicing of concerns in the organization related to accounting practices. On or around November 13, 2007, Guo wrote letters to NED President, Carl Gershman, and Vice President, Joseph Cooper Jr., pointing out ICPC's financial wrongdoings and pleading NED to intervene and correct the wrong.

98. At all relevant times, Mr. Carl Gershman and Mr. Joseph Cooper Jr., acting on behalf of NED, intentionally ignored Relator Guo's pleadings and intentionally participated in the decision to justify what ICPC had done with actual knowledge that they were actually presenting false financial reports to the U.S. Government.

99. At all relevant times, NED and ICPC refuted Relator Guo's inquiry into the ICPC financial problem as unfounded, irresponsible, and asserted that Relator Guo's inquiry should be categorized as defamation or fabrication.

100. After his expulsion, ICPC launched a campaign to smear and defame Relator Guo. Defendant Zhang and other ICPC management personnel frequently posted defamatory articles at ICPC online communities attacking Relator Guo's good character and professionalism.

101. Recent false statements published on ICPC's intranet discussion forums attacking Relators' character were published in April 2018. These statements again alleged that Relators are betrayers and squealers revealing confidential information to NED, having caused funding problems for ICPC. The statements further reprimanded Relators for bringing up financial violations and electoral fraud issues at ICPC's biannual members meeting as illegal and insulting act. ICPC also pretended that Relator Si has no standing and no credibility to question ICPC's financial activities because he was never at a position in charge of ICPC's financial issues.

102. Relator Si, after learning about the fraudulent activities, especially the failure to comply with incorporation and taxation requirements and the billing for monies that it was not entitled to receive, discussed the fraudulent ICPC activities as stated above with ICPC's management. On April 12, 2015, he sent a letter to the ICPC Board poining out the wrongdoings and demanding changes. In another situation in or about June 2015, he spoke with ICPC's then President Huang and requested him cease the violations immediately. Huang told Relator Si to let it go because that he was unable to manage the company and that all the financial matters were controlled by Defendant Zhang and others. Huang further indicated that it would be unlikely that NED would not say a word if Relator's allegations were serious.

103. On June 30, 2015, Relator Si again advised Defendant ICPC's Board of Directors that aspects of the ICPC's billing practices did not comply with accounting guidelines and resulted in the improper billing of at least $20,000 per reporting cycle to CDP. The Board rejected Relator Si's claim and reprimanded him for betraying the honor of ICPC for disclosing wrongdoing that is not being addressed by the company.

104. When realizing he will not get any solution from ICPC, in August of 2015, Relator Si wrote letters to NED contract management persons, Leah Flynn, Sinchang Chiu, and Marta Casey, pointing out the financial wrongdoings and pleading NED to correct the wrong. Acknowledging receipt of Relator's complaints and promising a formal investigation, NED did not respond him further. Nevertheless, NED approved all the questionable and problematic transactions and allowed ICPC's continued funding and wrongful uses till the end of 2017, despite the fact that money should not have been paid for the improper transactions and that Relator reported the specific violations.

105. In or about late 2015, NED's managers Sinchang Chiu and Marta Casey met with ICPC's then General Secretary Biao at NED's office. Biao was told by NED that Relator Si should not be placed in his position and that ICPC should not let Relator know those "private" financial information. Obviously, NED thought that Relator's complaining of nefarious activities caused NED trouble, therefore, it sought to get rid of Relator from CDP funded firms.

106. In several different circumstances in late 2015 and 2016 when ICPC sought funding renewal and requested payments under CDP, NED's manager Sinchang Chiu and Vice-President Louisa Greve informed ICPC's management that they should check with Relator Si to find out what exactly issues he reported to NED. These communications apparently asked ICPC to take retaliatory actions against Relator for his complaint.

107. In or about March 2016, Relator Si was discharged from his ICPC positions while he was promised earlier by ICPC's management that he would be continually hired for the same positions for the period from March 2016 to February 2018.

108. In or about late Septemeber of 2017, Relator Si had a conversation with PCI's President Chen and was informed that NED requested Relator's termination because of his reporting about financial irregularieis of ICPC and LRF. Relator Si learned that NED's program

managers Sinchang Chiu and Marta Casey summoned PCI's President Chen to NED's office in 2016 and 2017 several times and dictated Chen to discharge Relator Si.

109. Relator was informed that NED personnel, as Relator Si understands it, Sinchang Chiu,  Marta Casey, and Andrew Nathan insisted on Relator's Si's termination on the reason that Relators Si was an unmanageable person not "suitable" for his job and that he embarrassed NED when he questioned financial transactions that had already been paid by NED.

110. During this conversation, Chen confirmed Relator's good work performance but suggested that Relator stay away from PCI till the time when NED forgets about his complaining.

111. During the conversation, Chen stated to Relator that NED would be willing to continually fund PCI in October 2017 if it terminates Relator and hires "new" people instead.

112. On October 1, 2017, Relator Si was terminated from his employment with PCI because he voiced his concerns about Corporate Defendants' defrauding the Government.

113. PCI thereafter hired two new persons less qualified than Relator Si to replace him and NED continued its funding of PCI after confirming Relator's termination.

114. After his termination, Relator Si learned that a merger agreement or other similar co-operation agreement was entered between PCI and LRF in or about 2017-2018, and that LRF played an active part in terminating him from PCI.

115. Relator Si's termination was motivated, at least in part, by retaliation for his earlier co-operation with the DOJ bringing a *qui tam* action against LRF.

116. Being a parent company or a company having a controlling interest in PCI, LRF has a specific desire to get rid of him from PCI.

117. Being a subsudiary or a company seeking to get support funding from LRF, PCI wants to clear the way for its cooperation with LRF by terminatating Relator.

118. NED, LRF, and PCI failed to pay Relator Si the wages he rightfully earned from October 2016 to September 2017.

119. NED and ICPC failed to pay Relator Si the wages he rightfully earned from mid 2014 to March 2016.

120. Based on representations of several personnel who met with NED's upper management, one or more business partners of Relators were approached and instructed by NED program managers such as Sinchang Chiu and Marta Casey that they should terminate business relationship with Relators.

### COUNT I - FALSE CLAIMS UNDER 31 U.S.C. § 3729(a)(1)(A)
(By all Plaintiffs against Defendants NED, ICPC, PCI, and Zhang)

121. Relator-Plaintiffs reallege and incorporate by reference all preceding paragraphs.

122. As described above, Defendants NED, ICPC, PCI, Zhang, and DOES 1-10 presented, or caused to be presented false or fraudulent information in which Defendants certified that it was acting in complaince with all pertinent laws and regulations, especially and including those laws and regulations central to CDP when in fact Defendants were billing for and/or performing services it was not eligible to provide.

123. These fraudulent representations included falsely representing that: 1) they had to pay certain employees or contractors for their services while such persons never provided any services and a sham contract or a contract that the parties understood was fake was reported to bill China Democracy Programs; 2) they had to pay certain employees or contractors for their services while such persons were never paid and that funds was retained for personal use or non-CDP contract related work; 3) they had certain key personnel working for them and/or such individuals were on their management bodies when these individuals were not performing such services nor in the positions asserted; 4) that costs charged to CDP shall abide by relevant regulations while actually money was used as gifts, or for payments of personal expenses,

improper lobbying purpose, or other purposes inconsistent with the contract; 5) that expenses would be made directly from restricted bank accounts while actually money was distributed by and through secret accounts bypassing oversight to various persons overseas for improper purpose or for purpose inconsistent with the contract; and 6) that they met regulatory requirements to participate CDP as an U.S. based NGO. These representations were false and violated federal laws and regulations requiring that these conditions be met before an organization may qualify for CDP.

124. The United States, through its proxies under CDP, approved funding to which Defendants were not entitled because of Defendants' falsehoods and incurred damages as a result.

125. Accordingly, Defendants are liable for a civil penalty of not less than $5,500 and not more than $11,000 for each false claim and three times the amount of all damages sustained by the United States because of Defendants' false claim.

### COUNT II - FALSE STATEMENTS UNDER 31 U.S.C. § 3729(a)(1)(B)
(By all Plaintiffs against Defendants NED, ICPC, PCI, and Zhang)

126. Relator-Plaintiffs reallege and incorporate by reference all preceding paragraphs.

127. Defendants knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved.

128. Defendants knowingly made or caused to be made false statements during defendants' ceritifcation process under CDP administered by the DOS. Specifically, as detailed above, in numerous submissions to CDP, Defendants falsely stated the nature of their involvement and interests in CDP, and get a false or fraudulent claim paid or approved. Additional fraudulent representations included falsely representing that: 1) they had to pay certain employees or contractors for their services while such persons never provided any services and a sham contract or a contract that the parties understood was fake was reported to

bill China Democracy Programs; 2) they had to pay certain employees or contractors for their services while such persons were never paid and that funds was retained for personal use or non-CDP contract related work; 3) they had certain key personnel working for them and/or such individuals were on their management bodies when these individuals were not performing such services nor in the positions asserted; 4) that costs charged to CDP shall abide by relevant regulations while actually money was used as gifts, or for payments of personal expenses, improper lobbying purpose, or other purposes inconsistent with the contract; 5) that expenses would be made directly from restricted bank accounts while actually money was distributed by and through secret accounts bypasing oversight to various persons overseas for improper purpose or for purpose inconsistent with the contract; and 6) that they met regulatory requirements to participate CDP as U.S. based NGOs and obtain designated CDP entity status for A, B, C, D and Doe Defendants (in the form of eligibility criteria valued not less than 2 million dollars each year) under Government Contracts "Grant No. S-LMAQM-YY-GR-NNN" and/or "Grant No. S-OESDR-YY-GR-NNN". These representations were false and violated federal law and federal regulations that these conditions be met for a business to qualify as CDP certified.

129. Defendants knew these statements were false.

130. The United States approved the funding to which Defendants were not entitled because of Defendants' falsehoods and incurred damages as a result. Government relied on such false representations and, presuming such fraudulent invoices were accurate, paid Defendant more than what ought to have been reimbursed under the Contract and thereby the U.S. Government was damaged in an amount to be determined at trial.

131. Accordingly, Defendants are liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each false claim and three times the amount of all damages sustained by the United States because of Defendants' false claim.

### COUNT III - REVERSE FALSE CLAIMS UNDER 31 U.S.C. § 3729(a)(1)(G)
(By all Plaintiffs against Defendants NED and ICPC)

132.  Relator-Plaintiffs reallege and incorporate by reference all preceding paragraphs.

133.  Defendants knowingly made, used, or caused to be made or used, false records and/or statements to conceal, avoid or decrease their obligation to pay or transmit money orproperty to the United States - namely by failing, including through its VSBA, proposals, grant applications, and narritive reports, to disclose the true nature of ICPC and ICPC-2 involvement and financial structure in granted extensions of performance, which would have rendered it ineligible for all or part of the granted money it received.

134.  Defendant ICPC also falsely certified it had no other sources income and failed to included private donations under the contract prior to entering the contact with the DOS, which the govenrment relied on and provided exclusive funding for all of defendants operations.

135.  Defendants NED and ICPC knowingly submitted invoices to the U.S. government which included salary expenses for Relator Si, but Defendants did not properly pay Relator for his services from 2015 to 2017 under the contract. Defendants knowingly concealed that that the correct amounts were not paid to Relator and knowingly avoided reimbursement to the U.S. Government for amounts not paid to Relator.

136.  Defendants NED and ICPC knowingly submitted invoices to the U.S. government which included remuneration expenses for outside contributors, but Defendants did not properly pay those contributors for their work from 2014 to 2017 under the contract. Defendants knowingly concealed that that the correct amounts were not paid to contributors and knowingly avoided reimbursement to the U.S. Government for amounts not paid to contributors.

137.  Defendants NED and ICPC also refused to return the unused funds at least on the following occasions: around $84,000 in 2015 and around $40,000 in 2016 as stated *supra*.

138. Accordingly, Defendants are liable to the Government for a civil penalty of not less than $5,500 and not more than $11,000 for each false claim and three times the amount of all damages sustained by the United States because of Defendants' false claim.

### COUNT IV- CONSPIRACY CLAIMS UNDER 31 U.S.C. § 3729(a)(1)(C)
(By all Plaintiffs against Defendants NED, ICPC, PCI, and Zhang)

139. Relator-Plaintiffs reallege and incorporate by reference all preceding paragraphs.

140. By virtue of the acts described above, Defendant NED conspired with Defendant PCI to commit violations of 31 U.S.C. § 3729(a)(1)(A), (B), and (G) described above.

141. By virtue of the acts described above, Defendant NED conspired with Defendant ICPC to commit violations of 31 U.S.C. § 3729(a)(1)(A), (B), and (G) described above.

142. By virtue of the acts described above, Defendant Zhang committed overt acts in furtherance of the ICPC's conspiracy.

143. Each of the defendants committed one or more overt acts in furtherance of the conspiracy to violate 31 U.S.C. §§3729(a)(1)(A), (B), and (G), including but not limited to each time they made false records, false statements, and/or false certifications to conceal from the United States the Defendants' fraudulent scheme and false claims, and each time false claims were submitted or caused to be submitted to the United States.

144. Defendants ICPC, PCI, and Zhang conspired with Defendant NED to and did obtain CDP contracts through fraudulent means in violation of the False Claims Act, 31 U.S.C. §3729(a)(1)(C). The Government paid the false or fraudulent claims because of Defendants acts and incurred damages as a result.

145. Defendants ICPC and PCI , and Zhang knowingly conspired with Defendant NED to make, or caused to be made, false and fraudulent claims for federal funds. Defendants, and each of them, knowingly conspired to make or caused to be made false and fraudulent statements,

and/or created false records, to obtain contracts through fraudulent means and to get a false and fraudulent claim against such contracts paid.

146. Unaware of the defendants' conspiracy or the false and fraudulent nature of the bids and relevant submissions, the United States – in reliance on the claims and certifications submitted therewith – awarded contracts to Defendants and was damaged thereby. The amount of damages would include the total sum paid out and disbursed on each contract in which the Defendants submitted or caused to be submitted bid proposals that were awarded on behalf of the United States based on false claims of services.

147. Defendants' false statements and certifications claiming they are qualified U.S. based NGOs, and all the other above-identified material false statements, including false statements as to past performance, diverted government funds intended to be provided and which by law could only be provided to qualified U.S. based NGOs.

148. Defendant NED was fully aware of the split between the ICPC organizations and all the afore-mentioned irregularities, yet entered an agreement with ICPC allowing the problematic spending continue to exist into the end 2017.

149. Defendants' false statements as to X, Y, A, B, C, and D's status diverted government funds intended to be provided and which by law could only be provided to CDP qualified entities.

150. As a direct and proximate result of Defendants' conspiracy resulting in fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly numerous false claims that it would not otherwise have paid.

151. Defendants engaged in fraud in the inducement such that the United States was damaged in the entire amount of the contract funds awarded and paid to the Defendants.

152. As set forth in the preceding paragraphs, Defendants knowingly violated 31 U.S.C. § 3729(a)(1)(c) and have damaged the United States by their actions in an amount to be determined at trial.

**COUNT V - RETALIATION CLAIMS UNDER 31 U.S.C. § 3730(h)**
(By Relator Si against Defendants NED, PCI, and ICPC;
by Relator Guo against Defendants NED and ICPC)[3]

153. Relator-Plaintiffs reallege and incorporate by reference all preceding paragraphs.

154. Relator Guo was terminated and forced out of his association with Defendant ICPC because he was continuously speaking out against ICPC and NED's wrongdoing.

155. At the time Relator Guo was expelled from ICPC, much of information was still in Defendants' sole control. He made complaints to NED by providing some circumstantial evidence of fraud in that process and chains of inference to those evidence, which eventually led to uncovering of more evidence and this litigation aginst Defendants.

156. Relator Si was terminated and forced out of his employment by Sinchang Chiu, Marta Casey, and Andrew Nathan, Managers and Board Director of NED, acting in the course and scope of their employment for NED.

157. At the time he was terminated, Relator Si was engaged in activity of investigating fraud on the government. Relator Si made complaints to NED and there was an investigation of fraudulent practices he complained about and opposed.

158. Defendants terminated Relator Si as a direct result of retaliation for his complaints to their governing bodies and reporting to NED of false and fraudulent claims submitted by Defendants and their officers, agents and employees as set forth above.

---

[3] For the purposes of this Complaint, Count V conssists of two sub-claims, which apply to two Relators repectively. Relators do not contend that their retaliation claims need to all stand or fall together.

159. Defendants' termination of Relator Si and expulsion of Relator Guo because of their lawful protected activity described above constitutes retaliation in the terms and conditions of employment under 31 U.S.C. § 3730(h).

160. As a direct result of the discharge of Relator Si from Defendants' employment, Relator Si "shall be entitled to all relief necessary to make the employee whole. Such relief shall include reinstatement with the same seniority status such employee would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees."

161. As a result of Defendants' violations of 31 U.S.C. § 3730(h), Relator Guo has been damaged in an amount to be determined at trial.

### COUNT VI - DEFAMATION
#### (By Relator Guo against Defendants ICPC and Zhang)

162. Relator-Plaintiff realleges and incorporates by reference all preceding paragraphs.

163. Defendants ICPC and Zhang executed a public campaign to tarnish Relator Guo's careers and ruin his reputations (specifically in the Chinese dissident communities wherein Relator Guo was associated or could reasonably expect to be employed in the future) continuing into at least April 2018, by issuing statements (implicit and explicit) to ICPC members, neighboring CDP contractor companys, and in public meetings alleging that Relator was an unethical person acting illegally to make trouble.

164. Defendants knew when they published the statements that they were false or published them with reckless diregard as to their truth or falsity.

165. These defamatory statements and rumors held the Relator up to scorn, hatred, ridicule or contempt, in the minds of a considerable and respectable segment of the community. These rumors, initiated and spread by the Defendants at all relevant times and which continue to be

initiated and spread by the Defendants at the present time, have impacted and continue to impact Relator's business. Upon information and belief, but not yet known with sufficient certainty, one or more business partners have a greater tendency towards instability to these defamatory statements and rumors.

166. Accordingly, Defendants are liable to Relator Guo for an amount that the evidence supports, plus punitive damages in the amount no less than $500,000.00, costs and such other relief as this Courts deems just and appriorate.

### COUNT VII - VIOLATION OF FAIR LABOR STANDARD ACT
(By Relator Si against Defendants NED, ICPC, PCI, and LRF)

167. Relator-Plaintiff realleges and incorporates by reference all preceding paragraphs.

168. The FLSA mandates that an employer must pay employees wages for all hours worked.

169. At all times, Mr. Si was an "employee" covered by §207(a)(1) of the FLSA, and Defendants were employers equally responsible for the payment of legally compliant wages under §207(a)(2) of the FLSA.

170. Defendants NED, ICPC, PCI, and LRF failed to pay Mr. Si in the past and still owe him.

171. Defendants had knowledge that Mr. Si worked during those periods indentified above but failed to pay compensation for his work. Notably, Defendant NED's program managers Sinchang Chiu and Marta Casey notified ICPC's former President Huang in or about February 2016 that Mr. Si stayed and kept his working relationship, on "cashior"[sic] or other positions, with ICPC. While the NED management wanted to show their support for ICPC in its infighting against ICPC-2, this acknowledgment actually confirmed NED's knowledge of its obligation to pay Mr. Si.

172. Defendants' failure and refusal to pay Plaintiff the wages he rightfully earned as required by the FLSA, DCMWA, and DCWPCL was willful and intentional, and was not in good faith.

### COUNT VIII - INTERFERENCE WITH ECONOMIC RELATIONSHIP
(By Relator Si against Defendants NED and LRF)

173. Relator-Plaintiff realleges and incorporates by reference all preceding paragraphs.

174. Relator-Plaintiff Si has valid contracts existed between him and ICPC and PCI. NED and LRF had knowledge of the contract or facts which should have led it to inquire as to the existence of the contracts, and interfered with the performance of such contracts.

175. NED continually engaged in the acts described above intentionally and willfully from at least 2015 till date for the specific purpose of causing damage to Relator-Plaintiff Si, financial loss in his profession, and his economic right to, among other things, engage in his chosen profession without interference or damage to his personal and professional reputation.

176. LRF continually engaged in the acts described above intentionally and willfully from at least 2017 till date for the specific purpose of causing damage to Relator-Plaintiff Si, financial loss in his profession, and his economic right to, among other things, engage in his chosen profession without interference or damage to his personal and professional reputation.

177. NED and LRF engaged in the conduct described herein for the unlawful purpose of causing Relator-Plaintiff damage and loss without any justifiable cause for the actions or right to perform such actions.

178. If NED and LRF had not committed the conduct described in this action, Relator-Plaintiff would not have suffered actual damages and loss. His actual damages and loss were directly and proximately caused by Defendants' conduct, or by the conduct of their agents, representatives, and employees, and there was no negligence or wrongful acts on the part of Relator-Plaintiff contributing thereto.

179. Furthermore, Defendants' actions were done with actual malice and with the knowing intent to harm Relator-Plaintiff and to destroy his reputation, both personally and professionally.

180. The acts described herein caused actual damage to Relator-Plaintiff, including but not limited to: significant loss of income generated from his jobs with PCI and ICPC; damage to his professional reputation; emotional distress and mental anguish; and costs, expenses and attorney fees; and other damages and injuries as will be proven at trial.

## COUNT IX - BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING
### (By Relator Si against Defendants ICPC and PCI)

181. Relator-Plaintiff incorporates by reference all preceding paragraphs.

182. The contracts between Defendants ICPC and PCI and Relator contained an implied covenant of good faith and fair dealing, requiring Defendants ICPC and PCI to deal fairly and honestly with Relator-Plaintiff in all matters pertaining to their agreements.

183. Defendant PCI breached its duty of good faith and fair dealing with Relator-Plaintiff by the following conduct:

(a) promising to pay but using Relator-Plaintiff's service for free from October 2016 to September 2017, without ever intending to pay him;

(b) promising him continuing employment while simultaneously preparing to discharge him in 2016 and 2017;

(c) failing to timely inform him that Defendant NED conditioned the funding on PCI's termination of him while it communicated extensively with NED for almost one year till Relator's termination on October 1, 2017.

(d) failing to honestly inform him that Defendant LRF was negotiating a merger or cooperation agreement with PCI when it communicated extensively with LRF on termination of Relator Si.

184. Defendant ICPC breached its duty of good faith and fair dealing with Relator-Plaintiff by the following conduct:

(a) promising to pay but using Relator-Plaintiff's services for free from mid 2014 to March 2016, without ever intending to pay him;

(b) promising him being continually hired for the same positions while simultaneously preparing to discharge him in Febraury 2016 and thereafter;

(c) promising in 2016 and 2017 several times to refund $4,840, the money donated to ICPC's specific project and prepaid by Relator-Plaintiff for ICPC's business expenses, when Relator objected that the money was being used for a different purpose from the one that was originally intended, without ever intending to fulfil that promise.

(d) smearing Relator-plaintiff's character and distributing insulting statements to the ICPC board and its management team from 2015 till date. Such defamatory statements included, among other things, that Relator-Plaintiff is a "low, stupid, abnormal", "evil person", that he is a "traitor", a "thief inside the company", and "a crazy liar and nuts" with "disreputable character, genetic disorder and psychological flaws", that he "lost mind and conscience" to disclose ICPC's financial violations.

185. As a result of the Defendants' breach of their duty of good faith and fair dealing, Relator-Plaintiff suffered actual damages, including emotional distress and economic loss.

## PRAYER FOR RELIEF

WHEREFORE, Relators on their own behalf and on behalf of the United States, pray for judgment in plaintiffs' favor and against defendants, jointly and severally, as follows:

(a) That the Court enter judgment under Counts I, II, III, and IV against Defendants in an amount equal to three times the amount of damages the United States has sustained because of defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for

each action in violation of 31 U.S.C. § 3729, and interest, costs, and other recoverable expenses permitted by law.

(b) That Relators Guo and Si be awarded the maximum amount allowed pursuant to § 3730(d) of the Federal Civil False Claims act.

(c) That Relators Guo and Si respectively be awarded all damages provided for under 31 U.S.C. § 3730(h), the FLSA, and controlling common law.

(d) That Relator Guo be awarded of money for Defendants' defamatory and infringing activities acted with malice, in accordance with the evidence, but not less than $500,000, together with interest thereon for damage to his personal and business reputations.

(e) That the United States and Relators receive all such other relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury with respect to each claim in this Complaint.


Dated: December 18, 2018


Respectfully submitted,

_____/s/_____
Pengcheng Si, D.C. Bar # 1017850

**DWS Law Group PLLC**
1629 K ST. NW, STE 300
WASHINGTON, DC 20006
Tel:  (202) 810-3566
Fax: (202) 688-3892
Email: ssi@dwslawgroup.com
*Counsel for Relator/Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, a copy of the foregoing Complaint, along with a disclosure statement, will be sent to and was sent by Federal Express to:

Matthew G. Whitaker
ACTING ATTORNEY GENERAL
OF THE UNITED STATES
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

CHAD A. READLER
ACTING ASSISTANT ATTORNEY GENERAL
OF THE UNITED STATES
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

JESSIE K. LIU
UNITED STATES ATTORNEY
United States Attorney's Office
555 4th Street, NW
Washington, D.C. 20530

                                                 */s/*_____
Pengcheng Si (D.C. Bar 1017850)
**DWS Law Group PLLC**
1629 K ST. NW, STE 300
WASHINGTON, DC 20006
Tel:  (202) 810-3566
Fax: (202) 688-3892
Email: ssi@dwslawgroup.com
*Counsel for Relator/Plaintiff*