### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* **ZHI GUO,** *et al.,*<br><br>Plaintiff-Relators,<br><br>v.<br><br>**NATIONAL ENDOWMENT FOR DEMOCRACY,** *et al.*,<br><br>Defendants. | Case No. 1:18-cv-02986 (TNM) |

### <u>MEMORANDUM OPINION</u>

Zhi Guo and Pengcheng Si (collectively, Relators) move for default judgment in this qui tam action against Defendants Princeton China Initiative (PCI), Independent Chinese PEN Center (ICPC), Laogai Research Foundation (LRF), and Yu Zhang.[1]  Defendants have not appeared or participated in this suit.  After reviewing Relator's filings, the Court finds that they have shown liability for most claims and have met their burden on damages for some claims. The Court will thus grant in part and deny in part their motions for default judgment.

### I.

In 1998, Congress began directing the State Department to set aside funding for "nongovernmental organizations" devoted to "fostering democracy in China."  Compl. ¶ 21, ECF No. 1.  Congress has annually funded this China Democracy Program (CDP), allocating $215 million in 2018.  *See id.* ¶ 23.  According to the Complaint, this money passes through the National Endowment for Democracy (NED), a nonprofit corporation chartered by Congress to

---

[1] Guo and Si also sued the National Endowment for Democracy but have since dismissed all claims against it.  *See* Stipulation of Partial Dismissal, ECF No. 11.

encourage democracy abroad.  *See id.* ¶ 17; 22 U.S.C. § 4411.  NED "exercise[s] substantial day-to-day control" over CDP funds and passes those funds onto entities who apply for them.  *Id.* ¶ 74.  Entities apply through a "formal NED-administered process."  *Id.* ¶ 27.  To receive funds, organizations must agree to special conditions and certify that they meet certain qualifications.  *See id.* ¶ 27–30.

Defendants here apply for and receive those funds.  PCI, ICPC, and LRF are U.S.-based nonprofits connected to a community of Chinese political dissidents.  *See id.* ¶¶ 14, 15, 19.  Both ICPC and PCI have "entered into multiple contracts" with the Government for CDP funds.  *Id.* ¶¶ 14–15.  LRF "was formerly funded" through CDP.  *Id.* ¶ 19.  Defendant Zhang is an officer of ICPC who "resides in Sweden."  *Id.* ¶ 16.

Relators are "Chinese political dissidents and writers residing in the United States."  *Id.* ¶ 13.  At times, Guo and Si have worked for or been linked to Defendants.  From 2003–2007, Guo helped ICPC to formulate its bylaws and other policies.  Aff. of Zhi Guo ¶ 5, ECF No. 27-3 (Guo Aff.).  He never asserts that the organization employed him or paid him for those services.  ICPC ultimately expelled him in 2007 after he questioned ICPC's spending and accounting practices surrounding the use of CDP funds.  *See* Compl. ¶ 96.  After Guo's termination, Zhang and other ICPC personnel wrote online posts on ICPC-related forums attacking him.  *See id.* ¶ 100.

Si began working for PCI and ICPC in 2008.  *See* Decl. of Pengcheng Si ¶¶ 3, 12, ECF No. 27-4 (Si Aff.).  For ICPC, he performed administrative and IT-related duties, and for PCI, he was a "cashier and administrative assistant."  *Id.* ¶ 13.  Like Guo, Si discovered irregularities in ICPC's accounting of CDP funds, which he raised with ICPC's board.  *See* Compl. ¶ 102.  He also asked ICPC to change its financial practices.  *See id.* ¶ 103.  ICPC refused.  *See id.*  Si

2

observed similar behavior at PCI and told NED officials that ICPC and PCI were "defrauding" the Government. *Id.* ¶ 112. Both organizations eventually fired Si—ICPC in March 2016 and PCI in October 2017. *See id.* ¶¶ 107, 112. Si alleges that PCI fired him because LRF merged with PCI and wanted to retaliate against him for his earlier qui tam lawsuit against LRF. *See id.* ¶ 115; *see also Pengcheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 78 (D.D.C. 2014) (accusing LRF of misusing federal grant funds). Si also alleges that ICPC and PCI still owe him money for his work. *See* Compl. ¶¶ 118–19.

Relators filed this lawsuit in December 2018. They assert five claims under the False Claims Act (FCA), which allows a private plaintiff to act as a qui tam relator on behalf of the Government to recover damages and civil penalties. *See id.* ¶¶ 121–161; *see also United States ex rel. Bid Solve, Inc. v. CWS Marketing Grp., Inc.*, No. 19-cv-1861 (TNM), 2021 WL 4819899, at *2 (D.D.C. Oct. 15, 2021). With their FCA claims, Relators bring other federal and state law claims. Guo accuses ICPC and Zhang of defamation. *See* Compl. ¶¶ 162–166. Si accuses ICPC, PCI, and LRF of violating the Fair Labor Standards Act (FLSA); LRF of tortiously interfering with an economic relationship; and ICPC and PCI of breaching the implied covenant of good faith and fair dealing. *See id.* ¶¶ 167–185. Because Relators sued under the FCA, the Court sealed their Complaint while the United States considered whether to intervene. *See* 31 U.S.C. § 3730(b)(2).

The United States ultimately declined to intervene, leaving Relators to proceed alone. *See* Notice of Election to Decline Intervention, ECF No. 12. No Defendants have appeared or participated. The Clerk of Court thus entered default against each Defendant. *See* ECF No. 24 (ICPC and Zhang); ECF No. 25 (LRF); ECF No. 26 (PCI). In two motions, Relators now move for default judgment. *See* Pls.' Mot. for Default J. on Causes of Action 1, 2, 3, 4, and 5, ECF

No. 27 (Pls.' FCA Mot.); Pls.' Mot. for Default J. on Causes of Action 6, 7, 8, and 9, ECF No. 28 (Pls.' Tort Mot.).  As part of its consideration, the Court asked Relators for more information. *See* Order, ECF No. 29.  Relators have provided that information.  *See* Response to Order to Show Cause, ECF No. 30 (Show Cause Response).  Their motions are now ripe for disposition.[2]

## II.

Federal Rule of Civil Procedure 55 establishes a two-step process for default judgments. This process applies even in qui tam False Claims Act cases.  *See, e.g.*, *U.S. ex rel. Landis v. Tailwind Sports Corp.*, 324 F. Supp. 3d 67, 71 (D.D.C. 2018).  First, the Clerk of Court enters a default on the docket if the "party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend." Fed. R. Civ. P. 55(a).  Then the plaintiff moves for a default judgment under Rule 55(b).

Entry of a default judgment, however, "is not automatic." *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005).  First, the plaintiffs prove proper service of any defendants.  *See Salmeron v. District of Columbia*, 113 F. Supp. 3d 263, 269–70 (D.D.C. 2015).  The Court then must "conduct an inquiry into both liability and damages." *Bozzuto Contractors, Inc. v. Evans*, No. 19-cv-3292 (TNM), 2021 WL 1564437, at *2 (D.D.C. Apr. 21, 2021) (cleaned up).  On liability, the defaulting defendant admits every well-pled allegation in the complaint.  *See id.*

Once liability is established, "the Court must make an independent evaluation of the damages to be awarded." *Landis*, 324 F. Supp. 3d at 71 (cleaned up).  Plaintiffs must prove the amount sought "to a reasonable certainty." *Bozzuto*, 2021 WL 1564437, at *3 (cleaned up).

---

[2] The Court has federal-question jurisdiction over Relators' federal claims, *see* 28 U.S.C. § 1331, and supplemental jurisdiction over their state law claims, *see id.* § 1367(a).

Courts may rely on "detailed affidavits or documentary evidence" to determine the appropriate sum. *Boland v. Providence Const. Corp.*, 304 F.R.D. 31, 36 (D.D.C. 2014).

## III.

Before liability, the Court analyzes service of process on Defendant Zhang. Through proper service, plaintiffs provide legal notice to defendants. *See Portillo v. Smith Commons DC, LLC*, No. 20-cv-49 (RC), 2021 WL 3287741, at *2 (D.D.C. Aug. 2, 2021). Thus, when a plaintiff has not properly served a defendant, courts cannot issue default judgment. *See Gates v. Syrian Arab Repub.*, 646 F. Supp. 2d 79, 84 (D.D.C. 2009). The plaintiff has the burden to show that service was proper. *See Salmeron*, 113 F. Supp. 3d at 267.

Federal Rule of Civil Procedure 4(e) says that to serve a U.S.-based person, a plaintiff may deliver the service documents to the person; leave them at the person's "dwelling or usual place of abode with someone of suitable age and discretion who resides there"; serve the person's agent who may receive service of process; or follow the law for service "in the state where the district court is located or where service is made." Fed. R. Civ. P. 4(e).

Relators argue that they properly served Zhang under Federal Rule 4(e) when they delivered service documents to ICPC's address in Manassas, Virginia. *See* Return of Service/Aff., ECF No. 17; Return of Service/Aff., ECF No. 18. Relators say that Zhang "resided" at that address. *See* Show Cause Response at 5.[3] But their Complaint says that Zhang "resides in Sweden." Compl. ¶ 16. So service did not happen at Zhang's "dwelling or usual place of abode." Fed. R. Civ. P. 4(e)(2)(B). And although Relators have shown that Emily Wu—to whom they delivered the papers—is the registered agent for *ICPC*, *see* Pls.' FCA Mot.,

---

[3] All page citations refer to the pagination generated by the Court's CM/ECF system and all exhibit numbers refer to the numbered attachments to the CM/ECF filings.

Ex. 4, ECF No. 27-6, their documents do not establish that she is *Zhang's* "agent authorized by appointment or by law," Fed. R. Civ. P. 4(e)(2)(C).  Relators likewise do not allege that they personally delivered the documents to Zhang.  *See id.* 4(e)(2)(A).

With those service methods under Rule 4(e) foreclosed, Relators can rely only on state law "in the state where the district court is located or where service is made."  *Id.* 4(e)(1).  Neither law helps here.  Virginia does not allow service at an individual's place of business.  *See* Va. Code Ann. § 8.01-296 (2021).[4]  The District allows such service only "[i]f the court determines that, after diligent effort, a party has been unable to accomplish service by" other methods, all of which recite verbatim the methods in Federal Rule 4(e)(2).  D.C. Super. Ct. Civ. R. 4(e)(3).  As discussed, Relators' efforts under those methods failed as to Zhang.  And in any event, D.C. law requires plaintiffs seeking to serve a place of employment to first "file a motion with an affidavit specifying" their "diligent efforts to serve by" the approved methods.  *Id.* § 4(e)(3)(C).  Relators have filed no such affidavit.  Thus, the state laws at issue do not save Relators under Federal Rule 4(e).

More, Relators made no attempt to serve Zhang under the Rule that applies to him.  Federal Rule 4(f) provides multiple avenues of service on an individual living abroad.  Plaintiffs chose instead to proceed under the rule for serving a domestic individual, despite admitting that Zhang resides in Sweden.  *See* Compl. ¶ 16.  They failed to effect service under that rule and

---

[4]  In their Show Cause Response, Relators cite a Supreme Court of Virginia case in which the court upheld service "at a place where that party may receive mail."  *Washington v. Anderson*, 373 S.E.2d 712, 715 (Va. 1988).  That case, however, concerned the delivery of service documents to defendant's conceded residence.  *See id.* at 715.  Zhang has no admitted residence in Virginia.  More, the court there interpreted a Virginia requirement that plaintiffs must mail service documents only after posting those documents on the front door of defendant's abode.  *See id.* ("Construing subitem (b) of subdivision (2) of § 8.01-296 . . . .").  Relators here never attempted similar posting, making this case inapposite.

never attempted service under Rule 4(f).[5]  The Court will therefore deny the motions for default

judgment against Zhang.

## IV.

The Court next turns to Relators' FCA allegations.  Recall that by defaulting Defendants

admit every "well-pleaded allegation in the complaint."  *Herbin v. Seau*, 317 F. Supp. 3d 568,

573 (D.D.C. 2018) (cleaned up).  To be well pled, Relators' FCA allegations must meet the

heightened pleading standard of Federal Rule of Civil Procedure 9(b).  *See United States ex rel.*

*Cimino v. IBM*, 3 F.4th 412, 421 (D.C. Cir. 2021).  The Rule requires Relators to "state the time,

place[,] and content of the false misrepresentations, the fact misrepresented and what was

retained or given up as a consequence of the fraud."  *United States ex rel. Williams v. Martin-*

*Baker Aircraft Co.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004) (cleaned up).  Courts have sometimes

"characterized [this] burden as providing the who, what, when, and where with respect to the

circumstances of the fraud."  *Bid Solve*, 2021 WL 4819899, at *2 (cleaned up).

### A.

Relators first claim that ICPC and PCI presented false claims in violation of 31 U.S.C.

§ 3729(a)(1)(A).  A person violates that provision if he "knowingly presents, or causes to be

presented, a false or fraudulent claim for payment or approval" by the Government.  31 U.S.C.

§ 3729(a)(1)(A).  The FCA defines "knowingly" as having "actual knowledge" or acting "in

---

[5]  Relators respond that Zhang had actual notice of their suit because of the "factual
circumstances" surrounding service in Virginia.  *See* Show Cause Response at 5.  Relators
largely recycle arguments already rejected by the Court:  No evidence shows that Wu "holds out
as [ ] Zhang's resident agent," and although Zhang listed a Virginia address on state corporate
filings, that does not signify that he *resided* at the address.  *Id.*  More, this case is unlike *Ali v.*
*Mid-Atlantic Settlement Services, Inc.*, 233 F.R.D. 32 (D.D.C. 2006), cited by Relators.  There,
the plaintiff delivered service documents to multiple residences of defendant and spoke with him
on the phone about efforts to serve him.  *See id.* at 37–39.  Relators have presented no evidence
like a phone call to show that Zhang knew about their lawsuit.

deliberate ignorance" or "reckless disregard of the truth or falsity of the information." *Id.*
§ 3729(b)(1)(A).  And although ICPC and PCI submitted all claims for payment to NED, not
directly to the Government, the FCA covers false claims submitted to "a contractor, grantee, or
other recipient who has authority to use that money or property on the government's behalf."
*United States v. Novo A/S*, 5 F.4th 47, 50 (D.C. Cir. 2021) (quoting 31 U.S.C. § 3729(b)(2)); *see*
*United States ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632, 638 (7th Cir. 2016) ("FCA liability
attaches to any false claim to any entity—public or private—implementing a government
program or a program using government funds.").  Thus, false claims submitted to NED still
violate the FCA.[6]

The Complaint includes several well-pleaded allegations against ICPC of false claims.
Relators allege that ICPC in 2015 "faked" a project coordinator position and reported to NED a
bogus salary for that position, creating $18,000 in payment.  Compl. ¶ 38.  Similarly, from 2013–
2015, ICPC submitted timesheets for two individuals that the company said it had employed for
CDP-related work.  *See id.* ¶ 39.  Those individuals "did not conduct any actual work," yet NED
reimbursed ICPC for their services in the amount of $20,000 each per year.  *Id.*  And ICPC billed
CDP for a Hong Kong "satellite office" that was a bookstore used for personal use.  *Id.* ¶ 41.
From 2012–2016, ICPC received $50,000 from CDP for this fake office.  *See id.*

Finally, ICPC billed CDP in 2015 for $80,000 that the company had distributed into
personal bank accounts.  *See id.* ¶ 40.  Although Relators do not allege that the actual claim itself

---

[6] Relators also argue that NED is a quasi-governmental agency such that claims presented to it
are also presented to the Government.  *See* Show Cause Response at 3.  The United States filed a
brief asking the Court to reject that argument and to instead rely on the FCA's statutory
provisions.  *See* Statement of Interest, ECF No. 32.  As discussed above, the Court agrees that
the FCA's text suffices to show that claims made to NED still qualify as false claims under the
FCA.

was false, they do allege that by requesting reimbursement ICPC certified that it had

"maintain[ed] the funds in a restricted bank account." *Id.* ¶ 52.  And according to Relators, CDP

required a restricted bank account as a condition for funding.  *See id.* ¶ 29.  Thus, ICPC's claim

for $80,000 impliedly represented that ICPC had complied with a material requirement of the

program.  But ICPC had not complied.  Implying compliance with a material requirement while

requesting funds like this is a false claim.  *See Universal Health Servs., Inc. v. United States*, 579

U.S. 176, 190 (2016).

Relators also sufficiently allege that for each of these false claims ICPC knew of their

falsity.  For several claims, Si aired his concerns that ICPC was fraudulently billing for CDP

funds.  *See* Compl. ¶¶ 40–41.  ICPC overruled him and directed the payments anyway.  *See id.*

For the other claims, Relators allege that Zhang knew that ICPC was faking details on particular

positions or employees before submitting reimbursement for their alleged services.  *See id.*

¶¶ 38–39.  The Court imputes his knowledge to ICPC, his employer.  *See United States v.*

*DynCorp Int'l, LLC*, 253 F. Supp. 3d 89, 103 (D.D.C. 2017).  All told, Relators allege nine false

claims presented by ICPC with a value of $268,000.[7]

The well-pleaded allegations also show PCI's liability.  Relators allege that, starting in

2010, PCI listed as its employee a freelance writer who was a friend to one of NED's board

members.  *See* Compl. ¶ 63.  PCI claimed that it employed this person from 2010–2018 as a

researcher, *see id.* ¶ 64, though he "did not perform any actual work or services for PCI," *id.*

¶ 63.  PCI submitted "fake timesheets" to get reimbursement, *id.* ¶ 66, in the amount of $20,000

---

[7]  The Court treats as two false claims the allegations about the fake bookstore, *see* Compl. ¶ 41,
and the certification about bank accounts, *see id.* ¶ 40.  And because Relators specify that ICPC
received funds over three years for the two fictional individuals, the Court treats those
allegations as six false claims—two each year for $20,000 at a time.  *See id.* ¶ 39.  Adding those
to the one claim about the fake employment position makes nine total false claims.

per year, *see id.* ¶ 64.  And because Relators allege that PCI arranged this sham for a friend of a NED board member, Relators have also alleged that PCI knew about the falsity of the submitted claims.  Thus, Relators allege that PCI presented eight false claims with a value of $160,000.

Some of the false claims allegations are not well-pled.  For example, Relators allege that ICPC wanted, as part of a "Writers in Prison" project, more CDP funding to help blog writers detained by Chinese authorities.  *See* Compl. ¶ 36.  ICPC allegedly "buried" the requests for these funds under permissible funding categories, like labor and travel expenses.  *Id.*  These funds thus were gifts and donations to private persons—outlays prohibited by CDP's requirements.  *See id.* ¶ 73.  So far so good.  But Relators say that ICPC submitted fraudulent claims in this way "at least forty" times from 2008–2017.  *Id.* ¶ 37.  That final statement lacks sufficient detail.  Although Relators ably describe the overall scheme and "the fact misrepresented," *Williams*, 389 F.3d at 1256, they give scant details about when ICPC submitted false claims associated with that scheme.  Allegations of claims presented during an "open-ended time span" do not meet the Rule 9(b) pleading requirement.  *See id.* at 1257; *see also Cimino*, 3 F.4th at 424 (rejecting allegations of false claims presented "sometime during [an] agreement's five years").  Relators also do not say how much money ICPC allegedly presented for payment.  Without those details, Relators' allegations about ICPC's Writers in Prison project are not well-pled and do not support liability.

So too for certain allegations against PCI.  In some paragraphs of their Complaint, Relators allege that PCI claimed money for fictitious employees and falsely certified that particular individuals led branches of PCI that were not, in fact, branches.  *See* Compl. ¶¶ 58–61.  Relators say that the Government relied on those misrepresentations to award grants to PCI.  *See id.* ¶ 61.  But Relators provide little clarity about how much money PCI obtained under those

grants.  The Complaint contradicts itself—one paragraph says PCI received "around less than 1 million dollars each year," *id.* ¶ 60, and the next paragraph says they received "around $1 million per year," *id.* ¶ 61.  The Court cannot fill in those details.  Nor does the Complaint specify how many claims PCI submitted.  The Court holds that those allegations do not meet Rule 9(b)'s heightened requirement.

The same is true for Relators' statement that PCI "presented 50 false claims."  Pls.' FCA Mot. at 7.  The Complaint says only that certain "false statements occurred at least fifty times." Compl. ¶ 89.  False statements are not false claims, and in any event the Complaint does not specify how much money PCI got from any related claims.

Finally, Relators allege that PCI sought reimbursement in 2011–2015 for two alleged employees (named A and B) when they "had no real employment or service relationship with PCI."  *See id.* ¶ 65.  A and B were friends of NED board members.  *See id.*  Beyond that fact, the details peter out.  Relators say that PCI received "approximately $500,000 via A, B, *and other persons'* sham employment arrangement[s]."  *Id.* (emphasis added).  Because Relators add other unnamed false employees to this statement, the Court cannot say how much of the $500,000 related to misrepresentations about A and B specifically.  Relators do not identify any of the "other persons."  *Id.*  For this claim, Relators thus fail to allege details sufficient under Rule 9(b).

Although not all of Relators' allegations support liability, some of them do.  As to those allegations, the Court will enter default judgment against ICPC and PCI for liability on Count I.

**B.**

Relators next allege that ICPC and PCI made false statements in violation of 31 U.S.C. § 3729(a)(2).  *See* Compl. ¶¶ 126–131.  That provision penalizes anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to" a false claim

paid or approved by the Government.  31 U.S.C. § 3729(a)(2).  And a defendant who prepares a misrepresentation about a claim yet fails to submit the claim can still be liable for a false statement under the FCA.  *See United States v. Toyobo Co. Ltd.*, 811 F. Supp. 3d 37, 49 (D.D.C. 2011).

Relators' Complaint sufficiently alleges several false statements.  ICPC certified on multiple forms that "experienced accounting persons" oversaw the organization's financial management.  Compl. ¶ 42.  But Zhang held that oversight role, and he "has little knowledge" about accounting.  *Id.*  ICPC also said in multiple reports that Si led a compliance committee.  *See id.* ¶ 47.  He did no such thing.  *See id.*  Relators allege that ICPC made these statements so that it could "remain in CDP," *id.* ¶ 42, and "retain money received from CDP," *id.* ¶ 47, making the statements "material to" any potential false claims, 31 U.S.C. § 3729(a)(2).

Much of the same holds for PCI.  Although Relators have not alleged that a false claim arose from PCI's misrepresentations about its organizational structure, those same allegations support that PCI "knowingly made a false" statement about its structure.  Compl. ¶ 58.  PCI lied about its own branches and about who led those units.  *See id.* ¶ 59.  And according to Relators, those lies allowed PCI to bypass the requirement that CDP money could flow only to organizations, not individuals.  *See id.* ¶ 57, 59.  These misrepresentations were thus material for any false claim.

PCI also made a false statement as part of a bid to construct a Chinese news website.  *See id.* ¶ 68.  PCI said that H, a family member of PCI's president, was an "IT network consultant" on the project.  *Id.* ¶ 68–69.  PCI failed to disclose that relationship, thus circumventing the material anti-nepotism condition.  *See id.* ¶ 73(e).  Relators allege that the president of PCI

directed this arrangement.  *See id.* ¶ 68.  His knowledge of its falsity can be imputed to the whole company.  *See DynCorp*, 253 F. Supp. 3d at 103.

The Court accordingly finds ICPC and PCI liable for false statements under the FCA and will enter default judgment on Count II.

**C.**

Relators next allege that ICPC engaged in so-called reverse false claims, in violation of 31 U.S.C. § 3729(a)(1)(G).  *See* Compl. ¶¶ 132–38.  A reverse false claim occurs when a "defendant's alleged deception results in no payment to the Government when a payment is obligated."  *Hoyte v. Am. Red Cross*, 518 F.3d 61, 67 (D.C. Cir. 2008) (cleaned up).

Relators' allegations support ICPC's liability for two reverse false claims.  As a general matter, ICPC certified that it would return any unspent or unobligated funds at the end of its grants and "any remaining funds under one" of ICPC's budget categories.  Compl. ¶ 48. Relators allege, however, that ICPC often moved funds between categories to avoid this repayment obligation.  *See id.* ¶ 49.  That behavior contributed to the two reverse false claims. *First*, in 2016 ICPC submitted a $9,000 receipt ostensibly showing that the organization had paid an outside contributor with CDP funds.  *See id.* ¶ 49.  But the contributor never received the money.  *See id.*  He asserted that ICPC had tricked him into signing the receipt and had submitted that receipt "to avoid remitting money [ ] owed to CDP."  *Id.*  The allegations thus show that ICPC knowingly submitted a false receipt to avoid a repayment obligation.

*Second*, in January 2015 ICPC received word from NED that ICPC had accounted for only $16,618 of a $100,000 grant.  *See id.* ¶ 51.  ICPC then "simply submitted a fraudulent report that appeared as if ICPC full[y] spent all the granted money legitimately," when actually "the funds stayed in [ICPC's] bank account unused" until the grant expired.  *Id.*  That is a reverse

13

false claim.  ICPC again submitted a false statement to avoid paying back the grant money.

Because Relators give no reason to think ICPC's accounting of the $16,618 was fraudulent, the

Court construes these allegations as of a reverse false claim in the amount of $83,382.

Other allegations do not support liability for reverse false claims.  Relators emphasize

that ICPC did not disclose contributions from non-CDP sources.  *See id.* ¶ 50.  Relators say that

ICPC, as a condition of CDP, needed to report those contributions.  *See id.*  But Relators do not

say how failure to do so triggers an "obligation to" repay the Government, nor what amounts

ICPC would have to repay.  31 U.S.C. § 3729(a)(1)(G).  The Court cannot speculate about those

details.

Relators also allege that ICPC failed in 2016 to repay funds after the organization split in

two.  According to the hazy allegations, one side of the split took money from a restricted bank

account, and the other took the rest of the money in that account.  *See* Compl. ¶ 53.  The original

ICPC then allegedly failed to disclose these occurrences to NED or to the Government.  *See id.*

¶ 54.  Relators assert that they did this to avoid remitting $100,000, *see id.*, but the details of this

entire affair are too sketchy for the Court to follow.  The specified sums do not add up to

$100,000, and nowhere do Relators allege that any false statement over organizational structure

(if that is even what ICPC misrepresented) triggered an obligation to repay.  Those allegations

thus do not support liability for a reverse false claim.

In sum, the Court will enter liability against ICPC on Count III for two reverse false

claims in the amount of $92,382.

### D.

Relators also allege that ICPC and PCI conspired to commit the above violations of the

FCA, in violation of 31 U.S.C. § 3729(a)(1)(C).  *See id.* ¶¶ 139–52.  To plead an FCA

conspiracy, Relators must show that (1) "an agreement existed to have false or fraudulent claims allowed or paid by the United States"; (2) ICPC and PCI "willfully joined that agreement"; and (3) "one or more conspirators knowingly committed one or more overt acts in furtherance of" the conspiracy's object. *United States ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 608 F.3d 871, 899 (D.C. Cir. 2010) (per curiam).

Relators' conspiracy allegations focus mostly on NED, which is no longer a Defendant. But ICPC and PCI do appear. They submitted their false claims and false statements "at the direction of" NED. Compl. ¶ 88. Taken at face value, that statement alleges that ICPC and PCI agreed with NED to violate the FCA. As for overt acts, Relators allege that NED "instructed" ICPC and PCI to "bury their problematic expenses under other budget categories . . . so as to hide [the] real spending at issue." Compl. ¶ 89. That ICPC and PCI did so—as documented throughout the Complaint—is an overt act in furtherance of their agreement with NED to violate the FCA. *See United States ex rel. Tran v. Comput. Scis. Corp.*, 53 F. Supp. 3d 104, 133 (D.D.C. 2014) (finding a well-pled FCA conspiracy when the complaint was "replete with" alleged actions that parties took to advance a conspiracy). Based on those two allegations, which the Court accepts as true and to which Defendants agree by default, the Court finds liability for ICPC and PCI for conspiracy to violate the FCA.

The Court will enter default judgment against ICPC and PCI for liability on Count IV.

### E.

The Court now assesses and awards damages for these FCA violations. *First*, civil penalties. The FCA allows civil penalties "of $5,500 to $11,000 for each claim submitted." *See Landis*, 324 F. Supp. 3d at 74 (citing 31 U.S.C. § 3729(a)). The Court may determine the proper amount. *See Cook Cnty., Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 132 (2003). As

part of that determination, the Court considers the totality of the circumstances, including the seriousness of the conduct, Defendants' scienter, and the amount of damages suffered by the United States from the misconduct.  *See Landis*, 324 F. Supp. 3d at 74.

The Court awards the maximum penalty of $11,000.  According to the Complaint, Defendants' conduct was "intricate, far-reaching" and involved multiple false claims and statements.  *Accord United States ex rel. Miller v. Bill Harbert Const., Inc.*, 501 F. Supp. 2d 51, 56 (D.D.C. 2007).  Relators also allege that Defendants tried to cover up their lies by moving funds between budget categories, thereby avoiding detection by the Government.  *See id.* (awarding maximum civil penalty amount when defendant created confusion by changing names and shifting illegal profits "between contracts and companies so as to avoid detection").  More, Defendants' attempts to cook the books and bill the Government for fictitious employees are particular indicators of egregious conduct.  On similar facts, other judges in this district have granted comparable civil penalties.  *See United States v. Speqtrum, Inc.*, No. 10-cv-2111 (JEB), 2016 WL 5349196, at *4 (D.D.C. Sep. 23, 2016).

Based on those decisions and the egregiousness of Defendants' behavior, the Court will award $11,000 for each false claim submitted.  This decision is made on the Complaint's allegations—by defaulting, Defendants waived the chance to present mitigating evidence or to rebut Relators' representations about the fraudulent scheme.  ICPC submitted nine false claims, and thus will pay $99,000 in civil penalties.  For its eight submitted false claims, PCI must pay $88,000 in civil penalties.

*Second*, other FCA damages.  On top of civil penalties, the FCA allows for treble damages "which the Government sustains because of" a defendant's actions.  31 U.S.C. § 3729(a).  Generally, these damages "put[] the government in the same position as it would

16

have been" without the falsity of defendant's claims.  *United States v. Sci. Apps. Int'l Corp.*, 626 F.3d 1257, 1278 (D.C. Cir. 2010).   The proper amount is straightforward when defendants provide goods with an ascertainable market value.  Courts then calculate the difference in market value between the delivered non-conforming product and a conforming product.  *See id.* at 1278.

In cases like this one involving services, however, the damages suffered might be the full value of payments made.  Under this theory, the Government receives no value from the defendant because, had it known about the fraud, the Government would have made no payments at all.  *See id.* at 1279.  Relators argue that this is one of those cases.  According to them, Defendants' fraud defeated CDP's central purpose and violated relevant regulations so that the State Department never would have paid Defendants.  *See* Pls.' FCA Mot. at 10–14.  Their actions "created an unalterable moral taint" on the services provided.  *Id.* at 12.

The Court acknowledges that this theory is available to Relators.  But to recoup on default judgment all those funds, Relators must prove their amount to a reasonable certainty.  *See Bozzuto*, 2021 WL 1564437, at *3.  Relators have not done so.  Only one paragraph in Si's declaration asserts, without documentary evidence, that ICPC and PCI received a combined $6.7 million in CDP funds.  *See* Si Aff. ¶ 25.  In other words, Relators "simply list the dollar figures . . . without any explanation as to their calculation." *GAG Enters., Inc. v. Rayford*, 312 F.R.D. 230, 234 (D.D.C. 2015).  As part of its independent inquiry into damages, the Court cannot accept such perfunctory figures.

That said, Relators will recover some damages.  The Complaint shows that ICPC received $268,000 from its false claims and avoided paying $92,382 to the Government.  Treble that combined number is $1,081,146.  The Court will award that amount for ICPC's FCA violations.  As for PCI, it received $160,000 from its false claims.  Following the same process,

the Court will award $480,000 for PCI's FCA violations.  *See United States ex rel. Carmichael v. Gregory*, 270 F. Supp. 3d 67, 72 (D.D.C. 2017) (entering treble damages at default judgment for FCA violations in the amounts received by defendants from their false claims).

Between these damages and civil penalties, ICPC is liable for $1,180,146, and PCI is liable for $568,000 for their respective FCA violations.

### V.

Si alleges that his firing by ICPC and PCI was retaliation for his investigation into and complaints about the organizations' FCA violations.[8]  *See* Compl. ¶¶ 153–61.  To state an FCA retaliation claim, Si must show that (1) he engaged in protected activity and (2) that he was fired "because of" that activity.  *Williams*, 389 F.3d at 1260 (cleaned up).  The second prong requires a showing that Si's employer knew about his protected activity and retaliated against him based, at least in part, on his engagement in that activity.  *See United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 736 (D.C. Cir. 1998).  Claims of FCA retaliation need only meet the general pleading standard, not Rule 9(b).  *See Williams*, 389 F.3d at 1260.

Si's allegations support liability for FCA retaliation.  Three times in 2015, Si wrote or told members of ICPC's board about the irregularities that he noticed.  *See* Compl. ¶¶ 102–103.  He then reported his complaints to NED after ICPC did nothing in response.  *See id.* ¶ 104.  Si's reports no doubt comprise "lawful actions" to stop "[one] or more violations of" the FCA.  31 U.S.C. § 3730(h); *see Pengcheng Si*, 71 F. Supp. 3d at 99–101.  And his discussions with ICPC leadership show that ICPC knew that Si engaged in those lawful actions.  *See Pengcheng Si*, 71

---

[8]  Guo brought the same claim against ICPC but later agreed to dismiss it.  *See* Show Cause Response at 6–7.  The Court thus dismisses without prejudice that claim of retaliation.

F. Supp. 3d at 102 (finding allegations that relator openly questioned billing practice to corporate officer supported inference that company knew about relator's protected activity).

The only remaining question is whether ICPC fired him because of his complaints.  Other allegations confirm that it did.  NED officials directed ICPC not to place Si in a position with access to ICPC's financial information, *see* Compl. ¶ 105, and asked ICPC to "take retaliatory actions against [Si] for his complaint," *id.* ¶ 106.  And PCI's president later told Si that NED requested his firing—and ICPC complied—"because of his reporting about financial irregularities."  *Id.* ¶ 108.  So ICPC knew about Si's protected activity and, as the Complaint alleges, fired him "because of" it.  Si has stated an FCA retaliation claim against ICPC.

Si's allegations against PCI are lighter, but in the same vein.  As with ICPC, NED officials summoned PCI's president to their office and "dictated" Si's termination.  Compl. ¶ 108.  They said that Si had "embarrassed NED when he questioned" various financial transactions.  *Id.* ¶ 109.  PCI thus knew about Si's various reports to stop FCA violations—NED had informed PCI's president about them, and he in turn mentioned to Si that those actions led to his firing by ICPC.  *See id.* ¶ 108.  When PCI fired Si in October 2017, it did so "because he [had] voiced his concerns" about the organizations defrauding the government.  *Id.* ¶ 112. Admittedly, these allegations against PCI are not robust, especially when compared to the detail with which Si pleads against ICPC.  But given the lower pleading standard for this claim and PCI's default, the Court holds that Si has stated a retaliation claim against PCI.  The Court will enter default judgment against ICPC and PCI for liability to Si on Count V.

Which brings the Court to damages.  A successful claim entitles Si to various forms of relief, including "[two] times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including

litigation costs and reasonable attorneys' fees."  31 U.S.C. § 3730(h).  As always on default

judgment, Si must prove the amount of damages to a reasonable certainty.

He has failed to do so.  He requests $42,000 in lost wages, $12,000 in lost benefits

(presumably from what benefits PCI gave him), and "litigation costs."  Pls.' FCA Mot. at 16.  Si

gives no figure as to his litigation costs.  His other requests are only slightly more supported.  A

pay stub confirms that PCI paid him $1,750 per month.  *See* Pls.' FCA Mot., Ex. 3 at 2, ECF No.

27-5.  And he says that he was unable to find similar "work-from-home" jobs for two years after

leaving PCI.  Pls.' FCA Mot. at 16.   Two years at $1,750 per month indeed equals $42,000.  As

for his benefits, Si says that PCI paid $500 a month, which equals $12,000 across the same two-

year period.  *See* Si Aff. ¶ 5.  But Si gives no argument for why the FCA compensates him for

two years.  And Si's affidavit implies that he took on "additional employment" after PCI fired

him.  *See id.* ¶ 23.  If that new job paid Si more, or gave him benefits in greater amount, his

"special damages" from the firing would be lower.  31 U.S.C. § 3730(h).  Si thus has not proved

to a reasonable certainty that he is entitled to the requested damages.  And without more, the

Court cannot award him any of the types of damages laid out in the FCA.

## VI.

Rounding out the federal claims, Si alleges that ICPC, PCI, and LRF violated the FLSA.

*See* Compl. ¶¶ 167–72.  Specifically, Si alleges that Defendants violated 26 U.S.C. § 207(a),

which requires payment at an enhanced rate for an employee's overtime hours.  *See id.* ¶ 169.

The allegation about ICPC is insufficient.  Si never alleges that he worked any *overtime*

hours there.  *See* Pls.' Tort Mot. at 14–15.  True, his motion says that ICPC violated § 206,

which requires a minimum wage for all hours worked.  *See id.* at 8.  But ICPC has conceded only

what is found in the Complaint, not a later motion.  *See Sanchez v. Devashish Hosp., LLC*, 322

F.R.D. 32, 36 (D.D.C. 2017) (accepting facts in declaration "except to the extent that [it] seeks relief beyond that sought in the Complaint" (cleaned up)).  And the cause of action in the Complaint pertains to overtime hours.

As for PCI, Si first argues that PCI and LRF were his joint employers.  The Court agrees. Si alleges that LRF merged with PCI "in or about 2017–2018," which covers the period at issue. Compl. ¶ 114.  He also alleges that LRF "played an active part in terminating him."  *Id.*  These allegations support an inference that LRF "had [ ] control over the employment relationship" between PCI and Si.  *Harris v. Med. Transp. Mgmt., Inc.*, 300 F. Supp. 3d 234, 243 (D.D.C. 2018).  The following discussion of PCI's liability thus also applies to LRF.

Si alleges that PCI "failed to pay [him] the wages he rightfully earned from October 2016 to September 2017."  Compl. ¶ 118.  He also alleges that he is an eligible "employee" under § 207 and that PCI knew about his work from October 2016 to September 2017 but failed to pay him.  *Id.* ¶ 171.  Although he provides no timesheets for those overtime hours, his motion includes calculations of that time.  *See* Pls.' Tort Mot. at 14.  Because PCI (or LRF) does not respond to this action, the Court will accept Si's calculations.  *See Sanchez*, 322 F.R.D. at 36. The Court accordingly holds that Si has stated a claim against PCI for a violation of § 207(a). PCI is therefore liable for that violation.  The Court will enter default judgment against LRF and PCI for liability on Count VII.

As for damages, Si asserts that he worked eight overtime hours each month for nine months.  At $10.87 an hour—which is the figure proposed by Si—he earned $782.64.  He is entitled to that amount from PCI.  The FLSA also mandates that same amount in liquidated damages, *see* 26 U.S.C. § 216, unless PCI shows that it had "reasonable grounds" to think nonpayment complied with the FLSA, *id.* § 260.  Because PCI (and LRF) does not appear, Si is

entitled to liquidated damages of $782.64.  *See Ventura v. L.A. Howard Const. Co.*, 134 F. Supp. 3d 99, 105 (D.D.C. 2015).  Si also requests prejudgment interest, but courts in this district "deny prejudgment interest under [the FLSA] when a court awards a plaintiff the maximum amount of liquidated damages."  *Id.* at 102, n.2 (citing *Lopez v. Rodriguez*, 668 F.2d 1376, 1381 n.10 (D.C. Cir. 1981)).

On Si's FLSA claim, the Court will award default judgment against PCI and LRF as to liability and for damages of $1,565.28.  As joint employers, PCI and LRF are jointly and severally liable for that amount.  *See Ayala v. Tito Contractors, Inc.*, 82 F. Supp. 3d 279, 288 (D.D.C. 2015).

## VII.

Now to Relators' state law claims.  Because the Court exercises supplemental jurisdiction over those claims, it will apply D.C.'s choice-of-law rules for each claim.  *See Ideal Elec. Sec. Co. v. Int'l Fidelity Ins. Co.*, 129 F.3d 143, 148 (D.C. Cir. 1997).  The first step under those rules is determining whether a true conflict exists between the laws of multiple jurisdictions.  *See Krukas v. AARP*, 376 F. Supp. 3d 1, 27 (D.D.C. 2019).  A conflict does not exist when the competing laws "are identical or would produce the identical result on the facts presented."  *USA Waste of Md., Inc. v. Love*, 954 A.2d 1027, 1032 (D.C. 2008).  And without a conflict, D.C. law "applies by default."  *Krukas*, 376 F. Supp. 3d at 27.  If there is a conflict, however, courts "blend a governmental interests analysis with a most significant relationship test."  *Oveissi v. Islamic Repub. of Iran*, 573 F.3d 835, 842 (D.C. Cir. 2009) (cleaned up).  As discussed below, the Court need not reach that second step for any claim.

**A.**

First is Guo's defamation claim.  *See* Compl. ¶¶ 162–166.  He argues that ICPC defamed him when it wrote blog posts that Guo "was an unethical person acting illegally to make trouble."  *Id.* ¶ 163.  Other published statements included that Guo was a "betrayer[ ] and squealer[ ]" who caused financial troubles for ICPC.  *Id.* ¶ 101.  ICPC also claimed that Guo "help[ed] the Chinese Communist Party."  Guo Aff. ¶ 12.  He asserts that the statements were "devastating" to his personal status in the Chinese dissident community.  *Id.* ¶ 13.  Dissident organizations stopped inviting him to conferences, stopped accepting his articles, and generally blocked him from their communities.  *See id.* ¶ 14.

Guo is domiciled in New York.  *See id.* at 1.  The Court thus must first decide whether to apply D.C. law or New York law.  There is no conflict between the two jurisdictions.  Each requires (1) a false and defamatory statement (2) that is published (3) by a defendant whose fault is at least negligent and (4) that is actionable as a matter of law or caused special harm.  *See Kesner v. Dow Jones & Co., Inc.*, 515 F. Supp. 3d 149, 169–70 (S.D.N.Y. 2021); *Kambala v. Checchi & Co. Consult., Inc.*, 280 F. Supp. 3d 131, 140 (D.D.C. 2017).

Guo argues that some of ICPC's statements are defamatory per se.  Again, the laws do not conflict.  In the District, a defamatory per se statement makes the subject appear "odious, infamous, or ridiculous."  *Howard Univ. v. Best*, 484 A.2d 958, 989 (D.C. 1984).  New York likewise labels a statement defamatory per se "if it tends to expose a person to hatred, contempt, or aversion."  *Geraci v. Probst*, 938 N.E.2d 917, 922 (N.Y. 2010) (cleaned up).  Finding no conflict, the Court applies D.C. law.  *See Krukas*, 376 F. Supp. 3d at 27.

On the first element, two of ICPC's statements are defamatory.  To be false and defamatory, a statement must, at a minimum, "reasonably impl[y] false and defamatory facts."

23

*Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013) (cleaned up).  The statements

that Guo "act[ed] illegally," *id.* ¶ 163, and "help[ed] the Chinese Communist Party," Guo Decl.

¶ 12, are "laden with factual content."  *Ollman v. Evans*, 750 F.2d 970, 980 (D.C. Cir. 1984).

And their content is verifiably false.[9]  Guo did not act illegally when he reported concerns about

ICPC's finances, *see supra*, nor could anyone believe that a dissident like Guo sought to help the

Chinese Communist Party when he made those reports.  On the publication element, Guo alleges

that these statements appeared on "ICPC's intranet discussion forums."  Compl. ¶ 101.  That

communication to individuals other than Guo suffices for publication.  *See Zimmerman v. Al

Jazeera Am., LLC*, 246 F. Supp. 3d 257, 273 (D.D.C. 2017).   And ICPC acted negligently

because it failed to verify the truth of the statements before publishing them.  Indeed, the

Complaint alleges that ICPC "executed a public campaign" against Guo, Compl. ¶ 163, and

"knew" that the statements "were false" when published, *id.* ¶ 164.  ICPC concedes those

allegations by its default.

On the fourth element, Guo argues that ICPC's statements constitute defamation per se.

The Court agrees.  Statements that impute to the subject a "matter affecting adversely a person's

fitness for trade, business, or profession" are defamatory per se.  *Carey v. Piphus*, 435 U.S. 247,

262 n.18 (1978).  Here, those who heard or read ICPC's statements that Guo acted illegally and

helped the Chinese Communist Party would question Guo's status as an opponent of the Chinese

government—the same government that imprisoned him for 18 years.  *See* Guo Aff. ¶ 2.  As his

decreased invitations to conferences and "pro-democracy events" attest, many in the Chinese

---

[9]  Guo says that other statements—that he is a betrayer and a squealer—were also defamatory.
The Court disagrees.  Those words are "the sort of loose, figurative, or hyperbolic language
which would negate the impression" that the speaker is making a *factual* statement.  *Milkovich v.
Lorain Journal Co.*, 497 U.S. 1, 21 (1990).

dissident community broke their connections with him.  *Id.* ¶ 14.  Thus, ICPC's statements made Guo unfit for his chosen profession—spreading and endorsing opposition against the Chinese government.  Because Guo's allegations meet the required elements of a D.C. defamation claim, the Court will enter liability against ICPC on Count VI for the two defamatory statements.

Which brings the Court to damages.  Guo requests both general damages and special damages.  *See* Pls.' Tort Mot. at 6.  General damages compensate a plaintiff for intangible injuries, such as his reputational harm.  *See* Restatement (Second) of Torts § 621 cmt. a (1977).  In contrast, special damages compensate losses of an "economic or pecuniary" nature.  *Id.*  Because Guo has shown defamation per se, he does not have to prove general damages.  *See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 757 (1985).

Guo requests $300,000 in special damages.  *See* Pls.' Tort Mot. at 6.  How he reaches that figure is confusing.  He says that his income decreased by $120,000 in the three years after ICPC fired him in 2007.  *See id.*  He then posits that "assuming a conservative loss of income of $30,000 per year for ten years" after the firing, "that would equate to $300,000."  *Id.*

The Court does not question Guo's math, merely his rationale.  For one thing, the measure of damages does not begin when ICPC fired him, but when it defamed him.  And although he may state a defamation claim without alleging a time of defamation, *see Kamabla*, 280 F. Supp. 3d at 141, the Court cannot award appropriate damages without knowing when the defamation occurred and for how long Guo felt its effects.  The Complaint says that ICPC began defaming him "[a]fter his expulsion," but does not say when.  Compl. ¶ 100.  The Court thus cannot assume, without more, that the defamation began in 2007 when ICPC fired him.  And even if it could, Guo offers only conclusory reasons for why the Court should compensate him for ten years after that.

More, the $120,000 in lost income lacks any documentary support.  Guo simply asserts that ICPC's defamatory statements caused the entire $120,000 in lost income.  The Court needs more.  *See LaRue v. Johnson*, No. 16-cv-504 (EGS/RMM) 2018 WL 1967128, at *10 (D.D.C. Feb. 22, 2018) (awarding specific damages on default judgment for lost income when plaintiff submitted personal financial information about her business before and after defamation), *report and recommendation adopted*, No. 16-cv-504 (EGS), 2018 WL 2561036 (D.D.C. Apr. 4, 2018). Instead, Guo merely states a figure.

Despite those issues, the Court will award Guo special damages.  He says that ICPC's defamation caused him "great anguish, pain, and mental suffering."  Guo Aff. ¶ 15.  That distress led to medical problems.  He underwent multiple procedures, including a heart stent operation. *See id.*  He now takes ten pills a day.  *See id.*  All told, Guo says that he has incurred "medical expenses of $55,000."  *Id.* ¶ 17.  The Court finds that Guo has shown that ICPC's defamation, and Guo's distress at his tarnished reputation, caused those medical injuries.  The Court will award him $55,000 in special damages.  *See* Restatement (Second) of Torts § 623, cmt. a (1977) (authorizing special damages for "emotional distress caused by [defamation] and any physical harm resulting from [that] distress").

For general damages to his reputation, Guo requests $200,000.  *See* Pls.' Tort Mot. at 8. Courts have "substantial latitude" in determining the amount of general damages.  *Ingber v. Ross*, 479 A.2d 1256, 1265 (D.C. 1984).  The Court considers "the seriousness of the defamatory charge, the extent of distribution of the defamation, the extent to which the communication was actually believed, and [the] plaintiff's prominent and professional standing in the community." *Id.* (cleaned up).  Sometimes, nominal damages sufficiently vindicate a reputational injury.  *See Grossman v. Goemans*, 631 F. Supp. 972, 974 (D.D.C. 1986).

ICPC's statements accused Guo of illegal conduct and, worse for him, assisting the Chinese government.  ICPC disseminated those statements widely and the resulting backlash against Guo isolated him from the professional community to which he has devoted himself "for approximately 40 years."  Guo Aff. ¶ 3.  The Court thus finds that nominal damages will not adequately redress his harm.  But the Court will not grant the requested $200,000 because Guo fails to justify that figure beyond simply stating a dollar amount.  Instead, the Court will follow the award in *LaRue* and award Guo $40,000 in general damages for his isolation from "business contacts" and his "lowered [ ] personal and professional standing in the community."  *LaRue*, 2018 WL 1967128, at *9.

## B.

Next, Si claims that LRF tortiously interfered with his economic relationship with PCI.  *See* Compl. ¶¶ 173–80; Pls.' Tort Mot. at 16.  The Court first decides which law to apply:  The District's or Virginia's, where Si's contract with PCI existed.  Again, the laws do not conflict.  Both jurisdictions require (1) existence of a valid contract or business relationship; (2) knowledge of the contract or relationship; (3) intentional interference with that relationship; and (4) damages.  *See Whitt v. Am. Prop. Constr., P.C.*, 157 A.3d 196, 202 (D.C. 2017); *Schaecher v. Bouffault*, 772 S.E.2d 589, 602 (Va. 2015).  So the Court applies D.C. law.

The Court will enter liability against LRF.  According to the conceded allegations, Si had a "valid contract[]" with PCI, and LRF "had knowledge of" that contract.  Compl. ¶ 174.  For interference, Si alleges that LRF "played an active part in" his termination from PCI, *id.* ¶ 114, because LRF wanted to retaliate against him for his earlier suit against the organization, *see id.* ¶ 115.  LRF undertook these actions—namely, "urging" PCI to fire him, Si Aff. ¶ 11—with "knowing intent to harm" Si, Compl. ¶ 179.  And Si also alleges that LRF's actions caused loss

of income, damage to his reputation, and emotional distress.  *See id.* ¶ 180.  Si's allegations thus

state a claim for tortious interference with a business relationship.  The Court will enter default

judgment against LRF for liability on Count VIII.

Like many other claims, however, Si does not support his alleged damages.  He suggests

that LRF's interference caused him "a future wage and benefit loss."  Pls.' Tort Mot. at 17.  He

then asks for $54,000 in past damages and $36,000 in future damages.  *See id.*  These figures

have no documentary support.  He says that they compensate his "having to take on additional

employment" and his "inconvenience, stress[,] and anxiety."  *Id.*  But he offers no background as

to how he arrived at these numbers.  His failure to explain them, or any other amount of damages

resulting from LRF's interference, precludes an award of damages for this claim.  *See GAG*

*Enters.*, 312 F.R.D. at 234.

## C.

Finally, Si alleges that ICPC and PCI breached the contractual implied covenant of good

faith and fair dealing.  *See* Compl. ¶¶ 181–85.  Again, the Court decides whether to apply the law

of the District or Virginia, where Si executed the contracts.  *See id.* at 1 (noting Si's Virginia

residency and the Virginia headquarters of both organizations).

As with Relators' previous state law claims, the jurisdictional laws do not conflict.  That

consensus is to Si's detriment.  The District "does not recognize a claim for breach of the implied

covenant of good faith and fair dealing when brought by an at-will employee."  *Kerrigan v.*

*Britches of Georgetowne, Inc.*, 705 A.2d 624, 627 (D.C. 1997) (cleaned up); *see also Vasquez v.*

*Whole Foods Market, Inc.*, 302 F. Supp. 3d 36, 62 n.10 (D.D.C. 2018) (same).  Virginia similarly

does not allow that claim "in employment contracts."  *Sickles v. Torres Adv. Enters. Solutions,*

*LLC*, No. 11-cv-2224, 2020 WL 5530357, at *16 (D.D.C. Sept. 14, 2020) (quoting *Devnew v.*

*Brown & Brown, Inc.*, 396 F. Supp. 2d 665, 671 (E.D. Va. 2005)).  Si admits that his contracts with ICPC and PCI were "at-will employment" contracts.  Pls.' Tort Mot. at 16.

Applicable law thus bars Count IX, and the Court will not enter default judgment on that Count.

## VIII.

For these reasons, the Court will grant in part and deny in part Relators' motions for default judgment.  For liability, the Court will enter default judgment against ICPC on Counts I, II, III, IV, V, and VI; against PCI on Counts I, II, IV, V, and VII; and against LRF on Counts VII and VIII.

The Court will also award damages in these amounts:  Against ICPC in the amount of $1,275,146; against PCI in the amount of $569,565.28; and against LRF jointly and severally with PCI in the amount of $1,565.28.  A separate Order will issue.

Dated: February 18, 2022                                  _____
                                                          TREVOR N. McFADDEN, U.S.D.J.